Filed 1/5/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRISTAN MACKRETH,<br><br>    Defendant and Appellant. | H046266<br>(Santa Clara County<br>Super. Ct. No. B1794019)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**[CHANGE IN JUDGMENT]** |

BY THE COURT:

It is ordered that the opinion filed herein on December 9, 2020 be modified as follows:

1. On page 2, first incomplete paragraph, the final sentence is replaced with the following: "We reject these contentions. Defendant also seeks relief under Assembly Bill No. 1950 (2019-2020 Reg. Sess.), which took effect on January 1, 2021. Because defendant may be entitled to relief under that new legislation, we remand this matter to the trial court for that court to consider his request in the first instance."

2. On page 29, section V is deleted and replaced with the following:

"***E.***    ***Assembly Bill No. 1950***

On September 27, 2018, defendant was placed on court probation for three years for his misdemeanor convictions. After we issued our opinion in December 2020, defendant filed a petition for rehearing in which he sought relief under Assembly Bill No. 1950 (2019-2020 Reg. Sess.), which did not take effect until January 1, 2021. (Stats. 2020, ch. 328, § 1.) Assembly Bill No. 1950 amended Penal

Code section 1203a to limit to one year the length of a probationary period for a misdemeanor conviction.  (Pen. Code, § 1203a.)  One court has held that this amendment is retroactive to all nonfinal cases.  (*People v. Burton* (Nov. 9, 2020 BR054562) ___ Cal.App.5th Supp. ___ [2020 Cal.App. LEXIS 1174].)  The Attorney General filed an answer to defendant's petition for rehearing in which he argued that this amendment is not retroactive because probation is not punishment.

Because our record does not reflect the current status of defendant's probation, it would be premature for us to consider this issue in the first instance.  Instead, we will remand this matter to the trial court for it to consider this issue if defendant remains on probation.

## V.    DISPOSITION

The order of probation is reversed, and the matter is remanded to the trial court with directions to consider defendant's request for relief under Assembly Bill No. 1950."


This modification changes the judgment.

The petition for rehearing is denied.


Dated:_____            _____
                                                             ELIA, J.



_____            _____
      GREENWOOD, P.J.                             BAMATTRE-MANOUKIAN, J.

Trial Court:                                      Santa Clara County Superior Court
                                                  Superior Court No:  B1794019


Trial Judge:                                      Honorable Charles E. Wilson II
                                                  Honorable Allison M. Danner



Counsel for Plaintiff and Respondent:             Xavier Becerra
THE PEOPLE                                        Attorney General

                                                  Lance E. Winters
                                                  Chief Assistant Attorney General

                                                  Jeffrey M. Laurence
                                                  Senior Assistant Attorney General

                                                  Rene A. Chacon
                                                  Supervising Deputy Attorney General

                                                  Juliet B. Haley
                                                  Deputy Attorney General


Counsel for Defendant and Appellant:              Gabriel Bassan
TRISTAN MACKRETH

*People v. Mackreth*
H046266

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRISTAN MACKRETH,<br><br>    Defendant and Appellant. | H046266<br>(Santa Clara County<br>Super. Ct. No. B1794019) |

Defendant Tristan Mackreth was placed on court probation after he was convicted by a jury of misdemeanor resisting arrest (Pen. Code, § 148, subd. (a)(1)),[1] misdemeanor vandalism (§ 594, subd. (b)(2)(A)), and misdemeanor being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)).  On appeal, he challenges only the resisting arrest conviction.

His principal contention is that the trial court prejudicially erred in instructing the jury that he could be convicted of resisting arrest if he knew or "should have known" that the person he resisted was a police officer.  He asserts, based on this court's decision in *In re A.L.* (2019) 38 Cal.App.5th 15 (*A.L.*) that the crime of resisting arrest requires proof of *actual* knowledge.  We respectfully disagree with the decision in *A.L.* and decline to follow it to the extent that it states that actual knowledge is required for a resisting arrest conviction under section 148, subdivision (a)(1).

Defendant also makes other claims of instructional error, asserts that the trial court prejudicially erred in responding to a jury inquiry concerning the mental state element of

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

the resisting count, and contends that the trial court erred in denying his *Pitchess*[2] motion. We reject his contentions and affirm the probation order.

## I. THE PROSECUTION'S CASE

On August 17, 2017, just after midnight, Lisa Ward called 911 and reported that she "was just hit by a car" and "run off the road" by another vehicle and that it "was an intentional hit." Ward told the 911 dispatcher that the other car was "chasing me" with its lights off and then "totally sideswiped" her vehicle.

Sunnyvale Public Safety Officer Matthew Meyer was dispatched in response to Ward's call, which he understood to be reporting "a road-rage accident situation." Meyer arrived at the scene, which was outside a 7-Eleven, and he spoke to Ward and Arthur Megoloff, a bystander. Ward told Meyer that a car had been following her car and then had hit her car.[3] She was very "upset and hysterical," and "[i]t was difficult [for Meyer] to get much information from her, but it seemed like someone purposefully ran her off the road and rammed her car." Ward "seemed very confused."

Megoloff approached Meyer and told Meyer that the driver of the other car, a "White guy," "ran into 7-11." Megoloff said: "The guy ran in the store and was stuffing all kinds of shit down his pants." He also told Meyer that the "guy" "was kind of threatening manner to me . . . ." "I said, 'Hey, are you okay?' And he goes, 'No.' And he, you know, went all nuts on me." Megoloff told Meyer "there he is behind the counter . . . in the red shirt."[4]

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[3] Meyer's body-worn camera recorded the events that took place during his response to this incident.

[4] Megoloff testified at trial that he had seen defendant get out of one of the vehicles involved in the collision. He approached defendant and asked if he was okay. Defendant "kept saying 'call the police.'" Defendant, who was "putting things down his pants," also told Megoloff that he should "get to stepping before I got hurt . . . ." Megoloff, who understood this to mean that he "should be minding my own business,"

2

Meyer was concerned that someone who "was stuffing things down his pants" might have a weapon. As he approached the 7-Eleven, he could see clearly into the store. Meyer saw defendant behind the counter, and he became concerned that "there's a possible robbery about to happen." Meyer could also see the store clerk "dealing with a customer."

Meyer was wearing a "standard police uniform," and his badge was "readily apparent." Before Meyer entered the store, he made eye contact with defendant, who "immediately turned around and ran into the back store room." The store room was behind the register, and defendant slammed the door to the store room. Defendant's conduct enhanced Meyer's concern that a robbery was afoot, and Meyer called for backup "with lights and sirens," which is a "heightened level of response." When Meyer then entered the store, he saw that the store clerk appeared "clearly afraid," and the customer looked "confused." Defendant "re-appeared" with keys and "something else in his hands," which turned out to be a phone. Meyer drew his "tazer," pointed it at defendant, and yelled at him to "Get on the ground."[5]

Defendant, who looked "puzzled" and was "looking around kind of erratically," responded "Yes, sir" but was not immediately compliant. Defendant sounded "angry" and "was displaying pretty clear signs of being under the influence of a stimulant." His eyes were wide, and he was looking around. He was very sweaty and "very fidgety." Defendant said "Hey, sh-show me your badge." Meyer found this statement to be "kind of a strange question given the scenario." "[I]t seemed like there was a disconnect with reality." Defendant seemed to be "delusional," and Meyer did not think that defendant

walked away and then, as Megoloff saw a patrol car approaching, defendant ran quickly past him, again said " 'Call the police,' " and ran into the 7-Eleven.

[5] Meyer testified that his taser was technically a conductive electrical weapon (CEW) or stun gun.

3

believed he was a police officer. Defendant did not seem to "recognize the reality of what was going on."

Eventually, defendant got on the ground. Meyer told defendant "Do not move" and "I will tase you if you move." Despite this warning, defendant, who was just "feet from" Meyer, "pops up," and Meyer fired his taser at him. Defendant screamed and fell to the ground. However, the taser shot affected defendant for only about a second. Taser shots have "no residual effects," so "once you're off, it's like you're back to normal."

Defendant got up and ran "towards the store clerk." Meyer "pulled out [his] baton" and struck defendant twice with it, but the blows had no impact on defendant's movement. Defendant jumped over the counter and approached the store's front door. Megoloff, who was standing at the front door, slammed the door on defendant as defendant tried to go through it, which slowed but did not stop defendant.

Lieutenant Jonathan Griffith and Officer JW Carrell arrived to back up Meyer. Both of them were wearing standard police uniforms and readily apparent badges. Griffith arrived first, and he saw defendant "jumping over the counter" and pushing his way out of the store's door. Griffith understood that defendant was fleeing from Meyer, and he deployed his taser at defendant outside the store. The taser shot incapacitated defendant for only a second, so Griffith drew his baton.

Carrell, who had been told that he was responding to an assault with a vehicle, arrived just after Griffith and saw defendant running out the store's door and Griffith's ineffective taser shot. Carrell ran toward defendant, who was lying on his side on the ground. Defendant "kicked up towards" Carrell, and Carrell kicked defendant in the legs or upper body. Defendant quickly stood up, and Carrell got "tangled up" with defendant, "fell backwards," and ended up "rolling" on the ground with defendant as defendant "was twisting, turning, [and] grabbing at anything he could . . . ." Griffith hit defendant's lower leg with his baton and fell onto defendant. Meyer joined them, and the three officers struggled to gain control of defendant. Defendant "seemed very high, under the

4

influence." Carrell pinned defendant against a tree, but defendant continued to resist. Carrell yelled "stop resisting," and punched defendant four times in the face, which had no effect.

Meyer tried to grab defendant's hands, but defendant was holding his hands against his chest and "tensing up." Defendant's body was "tense and rigid," and he was trying to pull away from the officers. At one point, defendant grabbed Griffith's baton, but Griffith told him to let go and he did. Meyer "did a dry stun application" on defendant's shoulder, but there was no noticeable effect on defendant. The taser did impact Carrell, who got shocked and fell off of defendant. However, they were then able to handcuff defendant.

Once defendant had been handcuffed, he continued to "try to pull away and was like wriggling," but the officers employed no further force against him. The struggle outside the store lasted less than two minutes. Meyer suffered an abrasion to his knee during the struggle. Carrell suffered abrasions on his hands, elbows, and knee. Griffith had abrasions to his elbow and hand and suffered an atrial fibrillation. Megoloff, who was present during the entire encounter, "didn't see any excessive type actions by the police."

Unbeknownst to the officers, prior to the struggle, defendant had called 911 from the 7-Eleven and reported that he had been in a car accident. After defendant was handcuffed, he was taken to the hospital, where he told a police officer that he had taken a mixture of methamphetamine and PCP. Defendant's blood was drawn that evening, and methamphetamine, but not PCP, was found in his blood. The level of methamphetamine in his blood indicated that he was under the influence of methamphetamine at an "abuse level" at the time of the incident. A baggie of methamphetamine was found in defendant's car.

Methamphetamine may make a person "agitated" and result in "disorganized" thoughts. At high levels, a person may become aggressive or even violent. The highest

5

levels may cause delusions, hallucinations, and paranoia. "Your cognitive function is definitely impaired." Reaction times can be very slow. The combination of methamphetamine and "mental illness" can induce psychosis.

Defendant spoke with his sister from jail the day after the incident. He told her "I thought they [were] fake cops." He claimed that he was not resisting arrest because "I was just scared that they were—that it was the fake cops." "I didn't know they were real." His sister asked him if he had "told them you're bipolar," and defendant said "Yeah." The following day, he was interviewed by the police, and he told them "I didn't believe they were actually real cops." "I was obviously hallucinating. And I—I wasn't in my right mind. . . . if I knew that that—those were real cops, I wouldn't have done what I did." He admitted that he had been "fighting with" the police officers.

These events were captured on video. 7-Eleven surveillance videos show defendant entering the 7-Eleven, throwing an item behind the counter, obtaining a cordless phone from the clerk, and then trying repeatedly to walk behind the counter as the clerk repeatedly gestures to him not to do so. After that, as the clerk is conversing with a customer who had come in after defendant, both the clerk and the customer repeatedly look at defendant, who is holding the phone to his ear and gesticulating. Defendant then disappears into a back room, and the clerk follows him, escorts him out of the back room, and gestures to him to stay away from behind the counter. At this point, a police vehicle with flashing lights can be seen driving up in front of the 7-Eleven. Defendant again comes up to the clerk behind the counter before disappearing into the back room just before Meyer enters through the front door.

The 7-Eleven surveillance videos also show Meyer entering the store and walking through the store to near the door to the back room. Defendant then emerges from the back room and encounters Meyer. The specifics of their encounter are not visible on the surveillance video. Defendant is next seen suddenly running behind the counter and nearly colliding with the clerk, as Meyer draws his baton and chases after him.

6

Defendant catapults himself over the counter and scrambles out the front door of the 7-Eleven, nearly running into Megoloff, who had briefly entered the store but exited as defendant approached. The flashing lights of a second patrol car can be seen through the front door of the store as these events occur. Meyer runs around the counter and out the front door after defendant.

Meyer's body-camera video shows Meyer entering the store, walking toward the door to the back room, and encountering defendant. Meyer draws his taser and orders defendant to get on the ground. Defendant does not immediately comply. Meyer repeats his command several times, and defendant does eventually lie down on the ground. Although Meyer tells defendant not to move or he will tase him, defendant suddenly hops up and runs behind the counter with Meyer in pursuit. Defendant scrambles over the counter and out the door.

## II.    THE DEFENSE CASE

Defendant testified that he noticed Ward's car driving very slowly past his home as he was about to go out to the 7-Eleven to buy snacks and beer. When he left his home, he was behind Ward, who continued to drive very slowly. Defendant tried to pass her on the right, and she swerved into him. He swerved in response, and the two cars collided. Defendant pulled over, but Ward's car kept going. He could not find his phone, so he decided to go into the 7-Eleven to call the police and report the accident.

When Megoloff asked him if he was okay, he said "no" and "Call the police." He was "a bit upset," "agitated," and "confused," but he denied that he said anything to Megoloff that was threatening. He also denied stuffing anything down his pants. He did feel that he was having a "breakdown" at that time. When defendant walked into the 7-Eleven, he asked the clerk if he could use the phone. The clerk told him that the phone

7

was "in the back" so defendant "went in the back and got it" and called 911.[6] He gave the 911 dispatcher a false name, "Macbeth," because he was afraid.

Defendant testified that, when Meyer arrived, he did not know that Meyer was a police officer. "I honestly questioned whether he was a police officer. I didn't believe he was a police officer." "I had just called the police and I was waiting for a more professional approach by a police officer, not to tell me to get to the ground immediately with a tazer pulled on me." "I said 'show me your badge' because I didn't believe he was a police officer." As to Griffith and Carrell, defendant testified that he "was still in question to be honest" as to whether they were police officers. Defendant testified that he did not hit, kick, or attack any of the officers. He claimed that he was "extremely afraid" because he had been arrested a few weeks earlier "for something I didn't do." He thought the officers were trying to hurt him, possibly fatally.

On cross examination, defendant explained that he did not believe Meyer was a police officer because Meyer was rude to him. "I believe it could have been someone impersonating a cop." "Possibly. Because at the time, someone was arrested in Daly City for impersonating a police officer, and I thought that possibly it was, who knows, someone impersonating a police officer." "I didn't believe it was a real cop." Defendant claimed that he "did not see" Meyer's badge or "utility belt." He admitted that he was able to hear Meyer's commands. When asked why he obeyed Meyer's command, defendant testified: "Because he was holding a taser to me. I've—I suspected he was a cop. Did I believe he was real? At the time, no." He testified that he got up from the ground because "I believed I was under attack, essentially, and even by the police."[7]

---

[6] The 7-Eleven surveillance video showed that the clerk had handed a phone to defendant, which defendant then used, long before defendant ever went into the back room.

[7] Meyer's body-camera video showed that Meyer was stationary while defendant was on the ground.

8

He was "having a breakdown" because he "felt under attack." Defendant thought he might have been drugged earlier in the evening when he was at a strip club. But he testified that he did not feel high but only "was worried" at the time of the collision. Defendant admitted he "resisted" the officers and that he "ran away" from Meyer. He also admitted that he knew what police uniforms look like and that Meyer looked "similar" to a police officer.

## III. PROCEDURAL BACKGROUND

Defendant was charged with attempted robbery (§§ 212.5, subd. (c), 664) and misdemeanor vandalism (§ 594, subd. (b)(2)(A)) for an unrelated July 28, 2017 incident (which is not at issue on appeal) and assault with a deadly weapon (a car) (§ 245, subd. (a)(1)), misdemeanor resisting an officer (§ 148, subd. (a)(1)), and misdemeanor being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)) for the August 2017 incident. It was also alleged that he had committed the assault while released on bail (§ 12022.1) for the robbery charge. The on-bail allegation was bifurcated.

The jury acquitted defendant of attempted robbery and assault with a deadly weapon (and hung on the lesser included offense of assault), but it convicted him of vandalism, resisting arrest, and being under the influence of methamphetamine. The prosecution then dismissed the assault count. The court suspended imposition of sentence and placed defendant on court probation with 440 days in jail, which was deemed served. Defendant timely filed a notice of appeal.

## IV. DISCUSSION

### A. CALCRIM No. 2656: *Mental State Element of Resisting Arrest*

#### 1. *Background*

Both the prosecution and the defense asked the court to instruct the jury with CALCRIM No. 2656, the pattern instruction that describes the elements of resisting

9

arrest, and neither the prosecution nor the defense objected at the instruction conference to any of the language in the pattern instruction.[8]

The court gave CALCRIM No. 2656 as follows: "The defendant is charged in Count Four with resisting, obstructing, or delaying a police officer in the performance or attempted performance of his duties in violation of Penal Code section 148 [subdivision] (a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. Officer Meyer, Carrell, or Griffith was a police officer lawfully performing or attempting to perform his duties as a police officer; [¶] 2. The defendant willfully resisted, obstructed, or delayed Officer Meyer, Carrell, or Griffith in the performance or attempted performance of those duties; [¶] AND [¶] 3. When the defendant acted, he knew, or reasonably should have known, that Officer Meyer, Carrell, or Griffith was a police officer performing or attempting to perform his duties. [¶] Someone commits an act willfully when he or she does it *willingly* or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] A person who is employed as a police officer by the Sunnyvale Department of Public Safety is a *peace officer*. [¶] A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or

---

[8] Defendant's trial counsel did request a voluntary intoxication instruction "with respect to knowledge element for lawful performance of duties, 148." "I guess my position is it is a defense as to the resisting, obstructing, or delaying. The element of knowledge . . . is one that this instruction touches upon." He argued that "knowledge of the fact that he's a peace officer" was "a subjective element." "I think that this intoxication affected his ability to know that they were peace officers." The court was "reluctant" to give the instruction "without some case law support." After the defense was able to find only an "analogous case," the court refused to instruct on voluntary intoxication as a defense to resisting arrest. The court also told defendant's trial counsel that "you cannot say it has to be a reasonably [*sic*] intoxicated person, because that appears to have no support in case law . . . ." The jury was instructed that "[v]oluntary intoxication is not a defense to" resisting arrest, and the prosecutor told the jury that voluntary intoxication was "not a defense" to resisting arrest and that "[b]eing under the influence is not a defense . . . ."

10

using unreasonable or excessive force in his or her duties. Instruction 2670 explains when an arrest or detention is unlawful and when force is unreasonable or excessive."[9]

The prosecutor argued to the jury that she had proved the mental state element of the resisting count. "And when he acted he knew or reasonably should have known that these officers were peace officer[s] performing or attempting to perform their duties. Very easy. All three of these people are police officers. They testified to it and they were dressed like it that night." "But the standard here is also a reasonable person standard. In that situation, what a reasonable person knows that these are officers. There is an 'or' there in that element. The uniform and badge are apparent. It was obvious to everyone else that this was a police officer."

Defendant's trial counsel argued to the jury that the prosecution had failed to prove the mental state element of the resisting count. He told the jury: "So what this case comes down to is what the district attorney can prove is in [defendant's] head. Intent in other words." The defense did not dispute that defendant committed the acts: "Clearly, as we saw in the video, [defendant] runs. Clearly [defendant] tenses up. I don't dispute any of that. We all saw that on the video. [¶] What the prosecution hasn't proved is that he actually knew, was that he knew these were peace officers." "[W]hat the district attorney must prove is that he knew these were peace officers. And you have to ask yourself, how could he possibly have known that?" "[W]hen he's asking the officer for a badge—he doesn't know that this is an officer . . . ." Defendant's trial

---

[9] The remainder of the instruction told the jury: "The People allege that the defendant resisted, obstructed, or delayed Officer Meyer by actively disobeying lawful orders by fleeing from Officer Meyer. The People also allege that the defendant resisted, obstructed or delayed Officers Meyer, Carrell and Griffith by physically pulling away from them and by kicking them. You may not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of the alleged acts of resisting, obstructing, or delaying a police officer who was lawfully performing his or her duties, and you all agree on which act he committed."

11

counsel argued that the jury could consider whether defendant was suffering from a "meth delusion" because "[t]his goes to the element of knowledge. You should consider that in terms of whether he actually knew that they were peace officers . . . ." He conceded that defendant was "very paranoid clearly, but he's not trying to hurt anybody." "When he went inside and thought he was being attacked, he never tried to hurt the peace officers. He never tried to attack them. He tried to run from them."

The prosecutor challenged defendant's trial counsel's argument. "Defense counsel tells you that you need to—it's required that you believe—you believe that the defendant actually knew that they were police officers. That's actually not what the law tells you. [¶] The law is that he knew, and based on his actions you can conclude that he knew, or reasonably should have known. It is a reasonable person standard. Should he have reasonably known considering the circumstances that these were officers."

### 2. Analysis

Defendant contends that the trial court prejudicially erred in instructing the jury with CALCRIM No. 2656 because this instruction permitted the jury to convict him of resisting arrest if it found that "he knew, *or reasonably should have known*" that the person he was resisting was a police officer. (Italics added.) He argues that section 148, subdivision (a)(1) is not violated unless the defendant has *actual knowledge* that the person he is resisting is a police officer. In his view, proof that a defendant "reasonably should have known" that the person he was resisting was a police officer cannot support a conviction for violating section 148, subdivision (a)(1).

A person commits resisting arrest under section 148, subdivision (a)(1) when he or she "*willfully* resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ." (Italics added.) Defendant claims that the statute's use of the word "willfully" necessitates a conclusion that "actual knowledge" is required.

12

Defendant's argument presents an issue of statutory construction. We exercise de novo review when we engage in statutory construction. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 461.) "Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' [Citation.] 'When the language of a statute is clear, we need go no further.' " (*People v. Manzo* (2012) 53 Cal.4th 880, 885.) Where the language of the statute is potentially ambiguous, " '[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.' [Citation.] We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy. [Citation.] When construing a statute, 'our goal is "'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " ' " (*Id.* at p. 886.) "It is a settled principle of statutory interpretation that if a statute contains a provision regarding one subject, that provision's omission in the same or another statute regarding a related subject is evidence of a different legislative intent." (*People v. Arriaga* (2014) 58 Cal.4th 950, 960 (*Arriaga*).)

Application of the rules of statutory construction to section 148, subdivision (a)(1) inescapably leads to a conclusion that the Legislature did *not* intend for its use of the word "willfully" here to create a requirement of "actual knowledge."

First, the word "willfully" is defined in the Penal Code, and its definition does not encompass a requirement of actual knowledge. "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness *to commit the act*, or make the omission referred to. It does not require any intent to

13

violate law, or to injure another, or to acquire any advantage."[10] (§ 7, subd. (1), italics added.) A "willingness . . . to commit the act"—resisting, delaying, or obstructing—does not by itself incorporate a requirement of "actual knowledge." "The elements of crimes are of three varieties: actus reus, mens rea and attendant circumstances." (*People v. Jiminez* (1992) 11 Cal.App.4th 1611, 1624, fn. 7, disapproved on a different point in *People v. Kobrin* (1995) 11 Cal.4th 416, 419.) Here, the act was resisting, delaying, or obstructing, willfully was the mens rea, and the status of the victim was an attendant circumstance. A "willingness to commit the act" does not require actual knowledge of every attendant circumstance.

Second, the origins of California's resisting arrest laws in the 1800s demonstrate that the Legislature did not intend for the word "willfully" in section 148, subdivision (a)(1) to require actual knowledge. In 1850, the Legislature enacted the precursor to section 148. (Stats. 1850, ch. 99, § 92.) The 1850 resisting arrest statute provided that the crime of resisting arrest occurred if "any person shall *knowingly and wilfully* obstruct, resist, or oppose" an officer. (*Ibid*., italics added.) In 1860, the 1850 statute was amended to apply if "any person shall, *knowingly and willfully*, obstruct, resist, or oppose" an officer. (Stats. 1860, ch. 156, § 1, italics added.) In 1872, the Legislature enacted the original version of section 148 and also the original version of section 69, which also proscribes a form of resisting arrest. The original version of section 148 applied to "[e]very person who *willfully* resists, delays, or obstructs any public officer, in the discharge or attempt to discharge any duty of his office." (1872 Pen. Code, § 148.) The original section 69, like the current section 69, applied to

---

[10] Section 7 has defined the word "willfully" in this manner since it was enacted in 1872. (1872 Pen. Code, § 7; Stats. 1905, ch. 476, § 1.)

"[e]very person . . . who *knowingly* resists, by the use of force or violence, [an executive] officer, in the performance of his duty."[11] (1872 Pen. Code, § 69.)

By simultaneously enacting these two related statutes in 1872 and using "willfully" to describe the required mental state for a section 148 offense but "knowingly" to describe the required mental state for a section 69 resisting offense, the Legislature clearly expressed its decision to require *different* mental states for the two offenses. (*Arriaga*, *supra*, 58 Cal.4th at p. 960.) This is particularly true in light of the fact that the precursor to these statutes was a single statute that required both mental states. Had the Legislature intended for the two offenses to have the same mental state, it would have used the same words in both statutes to describe the required mental states.

Third, the Legislature's 1997 amendment of section 148 to add subdivision (a)(2), which uses "knowingly and maliciously" to describe the mental state required for the related offense of disrupting, impeding, or interfering with a police communication, provides further evidence of the Legislature's recognition that "willfully" in section 148, subdivision (a)(1) is not equivalent to actual knowledge. (Stats. 1997, ch. 111, § 1.) If the Legislature had intended for the two required mental states to be equivalent, it would have amended section 148, subdivision (a)(1) to match the mental state specified in section 148, subdivision (a)(2). By using different words to describe the required mental states in these adjacent parts of section 148, subdivision (a), the Legislature further demonstrated its intent that "willfully" in section 148, subdivision (a)(1) did not mean "knowingly." (*Arriaga*, *supra*, 58 Cal.4th at p. 960.)

---

[11] Section 69, both originally and currently, proscribes two different offenses. The first one is the specific intent offense of attempting by threat or violence to deter or prevent an executive officer from performing a duty. The second is a resisting arrest offense. (1872 Pen. Code, § 69; § 69.) The term "executive officer" includes peace officers. (*In re Manuel G.* (1997) 16 Cal.4th 805, 818.)

15

Fourth, the Legislature's 1997 action took place long after a Court of Appeal construed section 148, subdivision (a)(1) and found that it did not require actual knowledge. In 1986, the Fifth District Court of Appeal held that section 148, subdivision (a)(1)'s use of the word "willfully" required only that one "know, or through the exercise of reasonable care should have known, that the person attempting to make the arrest is an officer." (*People v. Lopez* (1986) 188 Cal.App.3d 592, 599.) The Fifth District found: "Before one can be found culpable, however, he or she must know, or through the exercise of reasonable care should have known, that the person attempting to make the arrest is an officer. Otherwise the statute is overbroad. It would make mere flight or fear of capture an offense." (*Ibid.*) "The standard applied here is not the subjective belief by the defendant that he was being chased by someone other than a police officer. The standard used in section 834a is that of actual knowledge or what a reasonable person should have known. This is an objective standard for measuring the knowledge of the actor. Under this ruling, section 148 still remains a broader statute. This is so because it not only proscribes resisting arrest, but it also limits other forms of hindering a police officer or other public official from executing the duties of his or her office." (*Ibid.*) The fact that the Legislature's 1997 post-*Lopez* amendment of section 148, subdivision (a) created a new offense that required actual knowledge while leaving unaltered section 148, subdivision (a)(1)'s "willfully" requirement is another strong indicator that the Legislature did not intend for a section 148, subdivision (a)(1) offense to require actual knowledge.

No published decision disagreed with *Lopez*'s holding until 2019, when another panel of this court issued the opinion in *A.L.* Defendant bases his argument on the opinion in *A.L.*, but his argument fails because we respectfully disagree with that opinion.

The minor in *A.L.* had been found by the juvenile court to have committed battery on a peace officer (§ 243, subd. (b)) and to have violated both section 69 and section 148, subdivision (a)(1). (*A.L., supra*, 38 Cal.App.5th at pp. 18-19.) On appeal, the minor

16

claimed that the juvenile court had applied the wrong legal standard in rejecting her argument that she had not committed any of these offenses because she believed that the police officers did not have the right to detain her. (*Id*. at pp. 19-20.) The minor claimed that the juvenile court had failed to properly consider her state of mind. (*Id*. at p. 20.)

The *A.L.* opinion assessed the nature of the mental state required for each of the minor's offenses. It concluded that, while battery on a peace officer requires only "criminal negligence," section 69 and section 148, subdivision (a)(1) both require "actual knowledge that the officer was performing a duty." (*A.L.*, *supra*, 38 Cal.App.5th at pp. 21-22.) The *A.L.* opinion reasoned: "Willfully is most naturally read as synonymous with knowingly, because ' "the term 'willfully' . . . imports a requirement that 'the person knows what he is doing.' " ' (*People v. Garcia* (2001) 25 Cal.4th 744, 752, quoting *People v. Honig* (1996) 48 Cal.App.4th 289, 334.) When 'willfully' is the mental state required for a crime, the perpetrator must have actual knowledge of the relevant facts. (*In re Jerry R*. (1994) 29 Cal.App.4th 1432, 1437.) Therefore, section 148, subdivision (a)(1)—like the similar offense described by section 69—requires that a defendant have actual knowledge he or she is resisting an officer in the performance of duty." (*Id*. at p. 22.)

The cases upon which the *A.L.* opinion relied do not support its conclusion. *People v. Garcia*, *supra*, 25 Cal.4th 744 did not hold that "willfully" always (or even usually) means actual knowledge. In *Garcia*, the court explained that "the meaning of the term 'willfully' varies depending on the statutory context." (*Id*. at p. 753.) It was statutory context that drove the *Garcia* court's decision that the Legislature's use of the word "willfully" in a statute criminalizing an *omission* was intended to import a requirement of actual knowledge into that statute. "In a case like this, involving a *failure* to act, we believe section 290 requires the defendant to actually know of the duty to act. Both today and under the version applicable to defendant, a sex offender is guilty of a felony only if he 'willfully violates' the registration or notification provisions

17

of section 290. [Citation.] The word 'willfully' implies a 'purpose or willingness' to make the omission. (§ 7.) Logically one cannot purposefully fail to perform an act without knowing what act is required to be performed. As stated in *People v. Honig* (1996) 48 Cal.App.4th 289, 334, 'the term "willfully" . . . imports a requirement that "the person knows what he is doing." [Citation.] Consistent with that requirement, and *in appropriate cases*, knowledge has been held to be a concomitant of willfulness. [Fn. omitted.]' " (*Id.* at p. 752, italics added.) Thus, *Garcia* does not stand for the proposition that "willfully" invariably means actual knowledge. The court took great pains to distinguish between statutes criminalizing omissions, where actual knowledge was required, and those criminalizing affirmative acts, where it had previously concluded that " 'willfulness' could include criminal negligence." (*Ibid.*) *People v. Honig*, *supra*, 48 Cal.App.4th 289 similarly held that the meaning of "willfully" depended on the context. (*Id.* at p. 334.)

In re *Jerry R.*, *supra*, 29 Cal.App.4th 1432 also did not hold that "willfully" invariably means actual knowledge. The issue in *Jerry R.* was whether a person who thought a firearm was unloaded could be found to have "willfully" discharged a firearm. The *Jerry R.* court stated that "the term 'willful' requires only that the prohibited act occur intentionally." (*Id.* at p. 1438.) The court found that a person could not be found to have intentionally *discharged* a firearm if the person thought the firearm was not loaded, since an unloaded firearm could not be discharged. (*Id.* at pp. 1437-1441.) In *Jerry R.*, unlike here, the perpetrator's mental state concerned the act—discharge—not an attendant circumstance, such as the status of the victim.

The historical development of resisting arrest statutes in California was not addressed in the opinion in *A.L.* Therefore, the opinion in *A.L.* did not consider the Legislature's 1850 and 1872 enactments, its use of different language in the original versions of sections 148 and 69, or its 1997 post-*Lopez* choice to retain "willfully" as the

18

required mental state for a section 148, subdivision (a)(1) offense while creating a related offense in section 148, subdivision (a)(2) that expressly required actual knowledge.

Based on our application of the rules of statutory construction and our review of the statute's legislative history, we hold that section 148, subdivision (a)(1) does not require actual knowledge. We therefore respectfully disagree with and decline to follow *A.L.* Accordingly, we reject defendant's claim that the trial court erred by instructing the jury with CALCRIM No. 2656 because the instruction did not require actual knowledge.

### B.     *Response to Jury Question Regarding CALCRIM No. 2656*

Defendant contends that even if actual knowledge is not required, the trial court prejudicially erred in responding to a jury question about CALCRIM No. 2656's use of the phrase "reasonably should have known."

The trial court had granted an in limine motion and ruled that defendant's "mental health situation" would not be referred to at trial. At the instruction conference, defendant's trial counsel noted that "we have a motion in limine that essentially prohibits both sides from talking about mental health." "[W]e both agree that mental health is not going to be discussed."

CALCRIM No. 2656 told the jury that the third element of the resisting count required a finding that "[w]hen the defendant acted, he knew, or reasonably should have known, that Officer Meyer, Carrell, or Griffith was a police officer performing or attempting to perform his duties. [¶] Someone commits an act willfully when he or she does it *willingly* or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage."

The jury began its deliberations on the afternoon of June 28, 2018. Early the next morning, the jury submitted the following question: "Count 4 (page 36) [CALCRIM No. 2656], point #3 has the clause 'or reasonably should have known.' Which of the following is the correct interpretation of this clause? [¶] a) 'or a reasonable person should have known' [¶] b) 'or reasonably should have known based on our

19

understanding of the defendant's reasoning ability' [¶] c) none of the above." The court gave a prompt written response to this question, which read simply: " 'A.' " The jury reached a verdict on the resisting count at the end of that day.

Defendant claims that the jury should have been permitted to consider his "mental breakdown" and "bipolar disorder" in deciding whether his "reasoning ability" was so deficient that he could not or did not perceive that the officers were police officers.

"In a criminal action, . . . evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged." (§ 25, subd. (a).) "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) Hence, evidence of a mental health issue is not admissible to show that a defendant lacked the capacity—what the jury referred to as defendant's "ability"—to form the required mental state, nor is it admissible to show anything other than the lack of a required specific mental state.

Since a violation of section 148, subdivision (a)(1) is not a specific intent crime, evidence of defendant's mental disorder was irrelevant and inadmissible to show that he lacked the ability to or did not actually perceive that the officers were peace officers. "The common law does not take account of a person's mental capacity when determining whether he has acted *as the reasonable person would have acted*. The law holds 'the mentally deranged or insane defendant accountable for his negligence as if the person

20

were a normal, prudent person.' " (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 519, (*Jefferson* ), italics added.)  Since section 148, subdivision (a)(1)'s mental state element is an objective one that focuses on whether a defendant "reasonably should have known" of his victim's status, defendant's mental health issues were irrelevant and inadmissible.[12]

Neither of the cases defendant cites provides any support for his claim.  *People v. Mathews* (1994) 25 Cal.App.4th 89 concerned *physical disabilities*, which are not governed by sections 25 and 28.  (*Mathews*, *supra*, at p. 99.)  He cites *Lopez*, but nothing in *Lopez* suggests that a person's "reasoning ability" or "mental breakdown" is admissible or relevant on the issue of whether he "reasonably should have known" that someone was a peace officer.  In *Lopez*, the Fifth District stated:  "The standard applied here is not the subjective belief by the defendant that he was being chased by someone other than a police officer. . . . [W]hat *a reasonable person should have known* . . . is an *objective standard* for measuring the knowledge of the actor."  (*Lopez*, *supra*, 188 Cal.App.3d at p. 599, italics added.)  When an "objective standard" applies, an individual's failure or inability to act reasonably, due to deficient "reasoning ability" or a mental illness, is irrelevant and inadmissible.  (*Jefferson*, *supra*, 119 Cal.App.4th at p. 519.)  Consequently, the trial court did not err in telling the jury that the "reasonably should have known" standard did not require the jury to take into account defendant's personal mental health deficits.

### C.  CALCRIM No. 2670:  *Lawful Performance Element*

Defendant contends that the trial court prejudicially erred in omitting two sections and including one sentence in the version of CALCRIM No. 2670 that it used to instruct the jury on the lawful performance element of the resisting arrest count.

---

[12] Notably, defendant's appellate claim is inconsistent with his position at trial. At trial, the parties obviously understood the irrelevancy of mental health evidence and agreed that defendant's "mental health" would not be "discussed" at trial.

### 1. Background

CALCRIM No. 2670 was requested by both the prosecution and the defense, and neither objected at the instruction conference to the trial court's proposed version of the instruction.

As part of CALCRIM No. 2656, the court instructed the jury: "A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties. [¶] Instruction 2670 explains when an arrest or detention is unlawful and when force is unreasonable or excessive."

The court then instructed the jury with CALCRIM No. 2670 as follows: "The People have the burden of proving beyond a reasonable doubt that Officer Meyer, Carrell, or Griffith was lawfully performing his duties as a peace officer. [¶] If the People have not met this burden, you must find the defendant not guilty of resisting arrest. A peace officer is not lawfully performing his or her duties if he or she is using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention. [¶] Special rules control the use of force. [¶] A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense. [¶] If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force. [¶] If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest a person, that person may lawfully use reasonable force to defend himself or herself. [¶] A person being arrested or detained uses reasonable force when he or she: (1) uses that degree of force that he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force; and (2) uses no more force than a reasonable person in the same situation would believe is necessary for his or her protection."

22

The prosecutor argued that she had established the lawfulness element of the resisting count. "[I]t essentially requires . . . a reasonable suspicion to detain. [¶] So they must believe that some sort of crime is happening to stop them on the street. They can't just go around stopping people without cause. They have probable cause to arrest, so they believe that there was some sort of crime and they have probable cause to arrest and they didn't use any unreasonable force." The prosecutor argued that Meyer "had reasonable suspicion to detain" based on what he had been told by Ward and Megoloff and his own observations of defendant behind the counter and displaying symptoms of being under the influence. She also asserted that Meyer "had probable cause to arrest." The prosecutor argued that Carrell and Griffith had "reasonable suspicion to detain" because they saw defendant's "active flight" from Meyer.

Defendant's trial counsel's argument to the jury spent little time on the lawfulness element and did not include any argument that the detention or arrest was unlawful. His argument on the lawfulness element touched only on the possible use of excessive force: "And any action that's undertaken that is reasonable in light of the excessive force, it's something that is a defense to this charge." "And what [defendant] is allowed to do is useable [*sic*] force against excessive force."

### 2. *Analysis*

#### a. *Omissions*

Defendant contends that the trial court prejudicially erred by omitting portions of CALCRIM No. 2670 that address the lawfulness of an arrest or detention.

The use notes for CALCRIM No. 2670 provide: "Give section A [addressing the lawfulness of a detention] if there is an issue as to whether the officer had a legal basis to detain someone. Give section B [addressing the lawfulness of an arrest] if there is an issue as to whether the officer had a legal basis to arrest someone. Give section C if there is an issue as to whether the officer used excessive force in arresting or detaining

23

someone." (Judicial Council of Cal. Crim. Jury Instns. (2020), Bench Notes to CALCRIM No. 2670.)

"California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, *disputed facts* bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v. Gonzalez* (1990) 51 Cal. 3d 1179, 1217, italics added.) "Disputed facts relating to the question whether the officer was acting lawfully are for the jury to determine when such an offense is charged." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020.)

" 'A party is not entitled to an instruction on a theory for which there is no supporting evidence.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 715.) Here, there was no evidence of an *unlawful* detention or arrest, and there were no disputed facts bearing on those issues. The information provided to Meyer by Ward and Megoloff indisputably supported both a detention and an arrest of defendant. Ward told Meyer that she had been intentionally hit by defendant's car, and Megoloff expressly identified defendant as the driver of that car. Defendant did not *dispute* the validity of Meyer's attempt to detain and arrest him, so he was not entitled to instructions on the validity of the detention and arrest. Similarly, it was undisputed that Carrell and Griffith had lawful grounds to detain and arrest defendant based on their observations of his flight from Meyer, and defendant did not dispute this. He disputed only the *level of force* used by the officers to detain and arrest him, and defendant makes no challenge to the adequacy of the court's instructions on the force issue.

Because there were no disputed facts concerning the officers' lawful basis for a detention and arrest of defendant, we find no error in the court's omission of the portions of CALCRIM No. 2670 addressing those issues. The jury was instructed that "[t]he People have the burden of proving beyond a reasonable doubt" that the officers were

24

"lawfully performing" their duties and that "[a] peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties." No further instructions were necessary on the undisputed issue of the lawfulness of the detention and arrest.

### b. *Erroneous Inclusion*

Defendant maintains that the trial court prejudicially erred by including in the version of CALCRIM No. 2670 that it used to instruct the jury the following sentence: "If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force."

The use notes for CALCRIM No. 2670 state: "If this instruction is only relevant to a charge of violating Penal Code section 148, the court **must not give** the bracketed sentence in section C that begins with 'If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her.' " (Judicial Council of Cal. Crim. Jury Instns., *supra*, to CALCRIM No. 2670.)

We agree with defendant that the trial court should not have given this sentence of CALCRIM No. 2670. However, it is difficult to conceive of how he could have been prejudiced by its inclusion in the instruction. The only defense theory concerning the lawful performance element that had any evidentiary support was the excessive force theory. The challenged sentence did not concern the excessive force theory and was expressly limited to the situation where the officer used "reasonable force." The very next sentence of the instruction told the jury that "[i]f a peace officer uses *unreasonable or excessive force* while arresting or attempting to arrest a person, that person may lawfully use reasonable force to defend himself or herself." (Italics added.) No juror could possibly have believed that the mistakenly included sentence had any impact on the excessive force theory. We find no prejudicial error.

25

### D. *Pitchess*

Defendant contends that the trial court erred in denying his *Pitchess* motion. The Attorney General contends that his motion was properly denied because the incident was captured on video, which made the discovery he sought irrelevant.

#### 1. Background

In May 2018, defendant filed a *Pitchess* motion seeking discovery of personnel records concerning Meyer, Griffith, and Carrell. He sought complaints against the officers for falsification of evidence or testimony, excessive use of force, or "acts involving moral turpitude." To support his request, defendant submitted his trial counsel's declaration. His trial counsel stated that discovery was merited because Meyer and Griffith had used force against defendant even though defendant was unarmed and had made no attempt to strike or attack either of them. He asserted that Carrell had knocked defendant down and falsely claimed that defendant was " 'showing active aggression.'" He also claimed that Meyer had made false statements about defendant's actions. Defendant's trial counsel maintained that evidence that these officers had a history of false testimony or use of excessive force would bolster defendant's claim of self-defense.

The City of Sunnyvale opposed defendant's *Pitchess* motion. It argued that defendant's showing was inadequate because it was predicated on a scenario that was at odds with the actions shown on the videos of the event. The City asserted that there was no dispute about the force used by the officers during the encounter, all of which had been captured on video. The City urged the court to "review and consider" the videos before ruling on defendant's motion.

At the hearing on defendant's motion, the trial court stated: "So my thought is there is no materiality since the whole thing is recorded." Defendant's trial counsel responded: "While the incident itself is recorded, there's perspective. And I don't object to the court having the opportunity to receive the video itself if the City Attorney has it.

26

If the court wishes to watch it, so be it. However, not every single angle is captured on this video camera. And while the officers made statements that a certain movement or a certain action by [defendant] was undertaken, I don't believe that it was undertaken. . . . [¶] So while there certainly was a physical altercation, I don't agree with the officer's versions. While it is recorded, I don't object to the court inspecting it if the court wishes to. I would just argue that those go towards the weight. Those would not go towards whether or not the officers are credible, or whether or not the actual incidents occurred."

The court rejected this argument: "Based on the fact that the incident was recorded by each of the officers that is the subject of the Pitchess request, the court finds that the defense has not met its initial burden of materiality. And it's going to deny the Pitchess motion."

At trial, Meyer's body-camera video, Griffith's body-camera video, a dash-cam video, and a 7-Eleven surveillance videos were all played for the jury and admitted into evidence.

### 2. Analysis

Defendant contends that he presented a plausible scenario that warranted the discovery he sought. He claims that the information he sought could have supported his excessive force claim because, despite the fact that he was unarmed and did not strike or attack the officers, the officers repeatedly shot him with their tasers, struck him with a baton, punched him, "grabbed" him, and "kneed" him.

A defendant's burden on a *Pitchess* motion is to "show a 'plausible' factual foundation" for the requested discovery. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1026.) "[A] plausible scenario of officer misconduct is one that might or could have occurred. Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges. A defendant must also show how the information sought could lead to or be

27

evidence potentially admissible at trial. Such a showing 'put[s] the court on notice' that the specified officer misconduct 'will likely be an issue at trial.' [Citation.] Once that burden is met, the defendant has shown materiality under section 1043. [¶] . . . [T]he trial court looks to whether the defendant has established the materiality of the requested information to the pending litigation." (*Ibid.*)

Defendant's written motion did not address the fact that the videos comprehensively documented the entire incident, including the actions of all three officers and defendant. Because everything was recorded, there was no dispute about what had occurred, and the defense did not dispute what had occurred but only whether the level of force used was justified and whether the mental state element had been satisfied. At the hearing on the motion, after the court questioned the materiality of the requested discovery in light of the videos, defendant's trial counsel provided no specific explanation of how information about the credibility of the officers and their prior use of force might be relevant and material. He merely claimed that "there's perspective" and that "not every single angle is captured on this video camera."

By failing to address the materiality of the requested discovery in light of the undisputed content of the videos, defendant failed to satisfy his burden. Evidence that any of the officers had lied on prior occasions or used excessive force in the past would not assist defendant in presenting a defense since the undisputed video evidence demonstrated precisely the force the officers had used on defendant and how he had acted. The four videos of the encounter were quite comprehensive and precluded the officers from misleading anyone about the nature of the events. The videos did not leave in question the nature of the force used or conduct of defendant that preceded the use of that force. Under these circumstances, defendant did not and could not justify the requested discovery without plausibly describing how some specific conduct that had not been captured on video might have been misrepresented by one of the officers or might constitute excessive force. The proffered justification for the motion was not "plausible"

28

in light of the videos.  We conclude that the trial court did not err in denying defendant's *Pitchess* motion.

## V.    DISPOSITION

The probation order is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

BAMATTRE-MANOUKIAN, J.

*People v. Mackreth*
H046266

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No:  B1794019


Trial Judge:                                    Honorable Charles E. Wilson II
                                                Honorable Allison M. Danner



Counsel for Plaintiff and Respondent:           Xavier Becerra
THE PEOPLE                                      Attorney General

                                                Lance E. Winters
                                                Chief Assistant Attorney General

                                                Jeffrey M. Laurence
                                                Senior Assistant Attorney General

                                                Rene A. Chacon
                                                Supervising Deputy Attorney General

                                                Juliet B. Haley
                                                Deputy Attorney General

Counsel for Defendant and Appellant:            Gabriel Bassan
TRISTAN MACKRETH