[No. C041274. Third Dist. June 15, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
SENQUE JEFFERSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III and IV of the Discussion.

## COUNSEL

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, and Charles A. French, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—Defendant Senque Jefferson appeals his conviction of three counts of battery upon correctional officers, arguing the trial court failed to account for his mental illness when (1) instructing on his defense of self-defense, (2) ruling on the admissibility of certain evidence, (3) denying his request to strike felony priors, and (4) sentencing defendant under the "Three Strikes" law. We disagree and affirm the judgment.

## PROCEDURAL HISTORY

By amended information, the People charged defendant with three counts of committing a battery on three correctional officers (Pen. Code, § 4501.5; all undesignated section references are to the Penal Code), and two counts of aggravated battery by gassing (e.g., putting bodily fluids) on two of the officers. (§ 4501.1.) The information also alleged defendant had been convicted of six prior serious felonies for purposes of the Three Strikes law. (§§ 667, 1170.12.)

Defendant pled not guilty and not guilty by reason of insanity. Trial was bifurcated on the issues of guilt, sanity, and commission of prior serious felonies.

In February 2002 at the guilt phase, the jury found defendant guilty of all three counts of battery against a correctional officer. It deadlocked on the gassing counts, and the court declared a mistrial on those charges.

At the sanity phase, the jury determined defendant was sane when he committed the three crimes for which he was convicted.

Finally, the jury found all six of the strike allegations to be true.

Defendant asked the court to dismiss the prior strikes, claiming a sentence under the Three Strikes law would constitute cruel and unusual punishment. The trial court denied the request.

The court sentenced defendant to state prison for two consecutive terms of 25 years to life on two of the battery counts and the prior strikes. It imposed a concurrent term of 25 years to life on the third battery count.

## FACTS

A. *Guilt phase*

On March 10, 2000, defendant was incarcerated at New Folsom Prison in the psychiatric services unit. That morning, Correctional Officers Brent Avery and Larry Anderson escorted defendant from the exercise yard back to his cell. Defendant's hands were handcuffed behind his back. When the trio reached defendant's cell, Avery looked inside it, then motioned a control officer to open the cell door. Defendant took a short step ahead of the officers, leaned forward as if to pick something up off the floor, then kicked Avery behind him in the stomach with his right foot. Avery described the kick as a "mule kick." It knocked Avery back into a railing.

Defendant then turned to face Anderson and began kicking him. At least one kick hit Anderson's right leg. To defend Anderson, Avery struck defendant with his fist, once in the shoulder and once in the back of the head. Then Avery grabbed defendant from behind and pulled him to the floor, face up. Defendant continued struggling and kicking. He spat at Avery, hitting him in the face and eyes. He also spat at Anderson, hitting him in the face and eyes. Anderson pulled out his pepper spray and warned defendant to stop or else be sprayed. Defendant continued to struggle, but with less intensity. A third officer arrived, and the officers put restraints on defendant's legs and a "spit net" over his head. They then escorted him to a holding cage. Neither Avery nor Anderson knew of any motive for defendant's attack.

On July 3, 2000, Correctional Officer Michael Edward Thomas was assigned to an infirmary at New Folsom Prison where inmates experiencing a mental health crisis are housed. A committee of mental health professionals reviews each inmate's placement in the infirmary twice each week. Thomas was assigned to take inmates from their individual infirmary cells to a smaller holding cell pending the committee's evaluation of each inmate.

That afternoon, defendant was in the holding cell waiting to meet with the committee. His hands were cuffed behind his back. He waited for about 30 minutes, at times being very loud, angry and verbal, at other times being quiet. The committee ultimately decided it would not meet with defendant that day, and instructed Thomas and his partner, Correctional Officer Michael Duke, to return defendant to his cell in the infirmary.

Duke went to the holding cell door and ordered defendant to turn around so he could inspect the handcuffs. Defendant, at that time quiet, complied. Duke then opened the cell door, and defendant slowly backed out of the cell. Once out, defendant turned and kicked Thomas twice with karate-style kicks to Thomas's left thigh. The first kick forced Thomas back into a wall; the second was a glancing blow. Duke grabbed defendant and forced him to the ground. Other staff arrived, placing leg restraints on defendant and injecting him with medicine. Thomas was not aware of any motive defendant may have had to attack him or Duke.

### Defense

Defendant admitted he was incarcerated because he had been convicted in 1994 of first degree murder and a number of counts of robbery.

About the March 2000 incident, defendant testified Officers Avery and Anderson were whispering to each other as they walked behind him, which made him nervous. Avery was handling him a little more roughly than usual.

As the officers placed him in his cell, defendant heard "voices" outside his head. The voices told him the officers would hurt or kill him when he was in his cell, so he kicked the officers to get them off him. Defendant did not recall spitting on either of the officers, and accused them of lying. He also accused Avery of choking him while he was on the ground, saying "some spit may have come out then."

Regarding the July 2000 incident, defendant stated the voices became loud while he waited in the holding cell, telling him not to leave the cell because the officers would hurt him. The officers were giving him "bad energy" by their movements and conversation. When the officers came to take him from the cell, he fell to the ground and kicked one of the officers with a "push-kick, like, like a lightly get-off-me."

Defendant stated he heard voices "everyday, all day." He started hearing them when he was housed at Pelican Bay. The voices were usually those of women he knew when he was out on the street. They told him such things as his food was poisoned or a family member had died. At the time of trial, he was on medication—involuntarily—that he felt lowered the voices. Although the voices were powerful, he was able to ignore them better.

Defendant believed on both occasions he had no choice but to do what he did. He felt he had to get the attention of a nearby sergeant so the officers would be supervised while taking him to his cell.

## B. *Sanity phase*

### *Defendant's evidence*

Defendant's case in the sanity phase consisted of testimony by himself; Dr. Louis Flohrs, a staff psychiatrist at New Folsom's psychiatry services unit; and Dr. Russell Ewing, a staff psychiatrist at New Folsom's "ag seg unit."

Defendant testified he had resided at New Folsom for about two years and had been treated for mental illness while there. He was first treated for mental disabilities while an inmate at Pelican Bay in 1996. He heard voices every day, sometimes all day long. The voices began in 1995. He also on occasion saw hallucinations of evil faces inside walls.

Defendant repeated much of his testimony from the guilt phase concerning the facts of the charged offenses and the role the voices played in each. At the time of the first incident in March 2000, he had stopped taking medication prescribed for him because it made him sleep too much. At the time of the

second incident in July 2000, defendant had refused to take his prescribed medication because the voices were telling him it was poison. He also had not slept for several days.

Defendant stated he thought of committing suicide every day. However, he acknowledged telling doctors he was suicidal even when he was not in order to be moved to the infirmary. He admitted he wanted to go to a state medical facility.

Dr. Flohrs testified he saw defendant in March 2000, when defendant asked Dr. Flohrs to increase his dosage of the drug Quetiapine. He declined the request. Under cross-examination, Flohrs confirmed he first saw defendant in November 1999, and concluded he had no major mental illness. At the March 2000 visit, Flohrs similarly concluded defendant was "Non-psychotic" and in a "stable mood." He was able to distinguish between right and wrong and knew and understood the nature and quality of his actions. Flohrs reached the same conclusion in August 2000.

In September 2000, defendant threatened to commit suicide and said the threat would get him admitted into the infirmary. In October, defendant escalated his threats and was admitted to the infirmary. He claimed the voices were telling him to hang himself. Flohrs, however, still saw no signs of mental illness, and questioned the veracity of defendant's claims.

Dr. Ewing had treated defendant for two years prior to trial. He diagnosed defendant as afflicted with schizophrenia, mixed type. His symptoms included angry paranoia towards New Folsom's staff, grandiose thoughts, auditory hallucinations, and claims there were worms in him. The symptoms waxed and waned. Ewing prescribed medications including Quetiapine, lithium and Cogentin. Defendant rarely cooperated and regularly refused to take his medication. He has been forced to take his medication since July 2001 pursuant to an order under *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526 [223 Cal.Rptr. 746].

On cross-examination, Ewing clarified that during the period of February through October 2000, defendant on two occasions displayed no evidence of mental illness, and at those times appeared able to distinguish right from wrong and to know and understand the nature and quality of his actions.

### Prosecution's evidence

The prosecution's case consisted of testimony by Dr. Franklin Curren, a staff psychiatrist in New Folsom's infirmary; Dr. Lauren Frank, a court-appointed psychologist; Dr. Mark Hoffman, a psychologist employed as New Folsom's clinical case manager; and Dr. Shawn Johnston, also a court-appointed psychologist.

Dr. Curren testified defendant was admitted to New Folsom's infirmary in February 2000 for "expressing suicidal ideation." Once admitted, defendant was verbally uncooperative. However, defendant told Curren he was not suicidal but knew what to say to get into the infirmary. Curren opined defendant was not psychotic at the time, was able to distinguish right from wrong, and could understand the nature and quality of his actions.

Dr. Frank met with defendant in April 2001 to evaluate defendant's competency and in August 2001 to evaluate his sanity. Frank asked defendant to describe the voices he heard during the two incidents at issue to determine whether defendant was faking a psychological problem. Defendant said they were voices of "people that he knew in the past" and were "in his ear." In Frank's experience, schizophrenics typically described voices "as coming from inside their head and being of either famous people or strangers or groups of people." She thus doubted defendant's claims.

Frank diagnosed defendant as having bipolar disorder, causing severe swings of emotion, from which he had suffered "his entire adulthood." She saw no indication of schizophrenia, which does not usually occur with bipolar disorder. She opined defendant had the ability to make a plan of action at the time of the incidents, exhibited by his statements he attacked the officers to draw the attention of their superiors. He also could predict the consequences of his acts because he knew the prison's rules and knew what would happen if he broke them.

Defendant told Frank if he threatened suicide, he would be evaluated for mental health problems; then he could be declared incompetent; and then he could be transferred to a state hospital, which was his goal. Based on defendant's statements to her, Frank concluded defendant understood the nature and quality of his acts and could distinguish between right and wrong. In her opinion, defendant was not legally insane at the time of the charged acts.

Dr. Hoffman met with defendant on the day of the first charged incident. Defendant stated he was upset because the officers interfered with an appointment he had that day with another doctor. According to Hoffman, defendant had "an awareness for what had happened" and related a "motive" for "why he was doing what he was doing." Hoffman saw no signs of schizophrenia or bipolar disorder. Hoffman warned defendant his behavior could result in a referral to the district attorney. Defendant responded he did not care about that because he could use the diagnosis of bipolar disorder "to mitigate any charges." Hoffman concluded defendant was legally sane that day.

Hoffman also saw defendant on October 10, 2000, and again concluded defendant had no major mental disorder. At that time, defendant threatened suicide unless he was transferred to a state mental hospital.

Dr. Johnston interviewed defendant in June 2001, and also reviewed the incident reports. Defendant engaged Johnston in a rational and goal-oriented conversation. He did nothing "suggestive of a mental illness or a thought disorder or a psychosis." Johnston saw no overt signs of schizophrenia. He diagnosed defendant as having an antisocial personality disorder that could include schizophrenia in control or under remission. Johnston opined defendant was aware of the nature and quality of his acts when he did them and also understood they were wrong.

### Defendant's rebuttal

Defendant testified his statement to Hoffman about officers interfering with a medical appointment did not refer to the two victims of the first incident. He stated he did not speak with Hoffman on the day of the incident, and accused Hoffman of lying when he dated his report March 10, 2000.

## DISCUSSION

### I

### Evidence of Mental Illness on Issue of Self-defense

Defendant argues the trial court erred in not admitting evidence of his mental illness during the trial's guilt phase for purposes of establishing the "reasonable person" standard in support of his defense of self-defense. He asserts the evidence was relevant to establish a "reasonable person" in this case was a person in defendant's condition, and the trial court's actions denied him his constitutional right to present a defense. We disagree.

### A. Background facts

Before trial, the prosecutor moved to exclude evidence of defendant's mental condition during the guilt phase. He claimed the evidence was not relevant to determining guilt of the charged general intent crimes.

Defense counsel argued granting the motion would deny defendant an opportunity to present his defense of self-defense. The evidence, she asserted, was relevant to applying the reasonable person standard, and in this case a reasonable person was one in a mental health prison ward being treated for

mental illness. Defense counsel also claimed she had the right to cross-examine the correctional officers on how they were trained to handle mentally ill inmates because the standards of excessive force would be different when handling mentally ill inmates instead of normal inmates.

The trial court granted the prosecution's motion and denied the defendant's request, both on the grounds of relevance. However, during trial, the parties agreed defendant could testify of hearing voices and fearing the correctional officers because of those voices. The prosecutor acknowledged the evidence was relevant to showing defendant's subjective belief in imminent harm, but he continued arguing the evidence was not relevant to whether that belief was objectively reasonable. Defendant repeatedly testified he kicked the officers in both incidents only because the voices told him the officers were about to attack him.

With regard to jury instructions, defense counsel requested an instruction on self-defense by which the jury would determine the reasonableness of defendant's fear from the perspective of someone with defendant's mental illness who hears voices. The court denied the request.

During closing argument, defense counsel asserted the reasonable person standard required the jury to consider the circumstances in which the defendant acted. Under this standard, she stated, "You place a reasonable person in the infirmary by guards who are not acting right, and this person is now cycling, hears voices talking, and he's trying to fight the voices." The court sustained the prosecution's objection of improper argument regarding the law of self-defense, but defense counsel continued along the same theme. The court again sustained the prosecution's objection of improper argument.

On rebuttal, the prosecution argued: "[A] reasonable person in the same or similar circumstances would be a reasonable person in prison. Not a reasonable mentally ill person. Not a reasonable person who is hearing voices. In fact, you can't get further apart from a reasonable person. [¶] Reasonable person is not somebody [who is] mentally ill. A reasonable person is not somebody [who is] hearing voices."

The trial court instructed the jury on self-defense pursuant to CALJIC No. 5.30, stating in pertinent part: "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so, that person may use all the force and means

which he believes to be reasonably necessary and which would appear to a reasonable person in the same or similar circumstances to be necessary to prevent injury which appears imminent."

During its deliberations, the jury asked the court if it could consider defendant's mental state as one of the "circumstances" referenced in CALJIC No. 5.30. After obtaining approval from both counsel, the court responded in writing: "In determining how a reasonable person would act, you cannot consider as a circumstance a mental state unique to the defendant which affected his ability to perceive the situation. You are to consider how a reasonable person in the defendant's position and with his knowledge would act."

B. *Analysis*

■ For an assault to be in self-defense, the defendant must actually and reasonably believe in the need to defend. "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' (CALJIC No. 5.50.) It judges reasonableness 'from the point of view of *a reasonable person in the position of defendant* . . . .' (*People v. McGee* (1947) 31 Cal.2d 229, 238 [187 P.2d 706] [italics added].) To do this, it must consider all the ' " " 'facts and circumstances . . . in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.' " ' (*People v. Moore* (1954) 43 Cal.2d 517, 528 [275 P.2d 485], italics in original.) As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' (*People v. Smith* (1907) 151 Cal. 619, 628 [91 P. 511].) [¶] . . . [¶] . . . Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found [himself]." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083 [56 Cal.Rptr.2d 142, 921 P.2d 1].)

For purposes of applying this test, defendant argues a reasonable person in this instance is one who is confined in a prison's psychiatric services unit. Evidence of the conditions of confinement, he continues, including his mental illness and the staff's training, should be considered by the jury "to determine whether the defendant had reasonable grounds for an honest belief that he was in imminent danger." He asserts the trial court's actions in granting the prosecution's in limine motion, denying his request for a jury instruction, and

responding to the jury's question in the manner it did violated this test and unconstitutionally prevented him from raising his defense of self-defense.

■ Defendant misstates the objective "reasonable person" test. The issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger. The issue is whether a "reasonable person" in defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm.

By definition, a reasonable person is not one who hears voices due to severe mental illness. In blunt fashion, our Supreme Court long ago defined a reasonable person as a "normal person." (*Katz v. Helbing* (1928) 205 Cal. 629, 638 [271 P. 1062].) The reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be. (See, e.g., *Davidson Steamship Co. v. United States* (1907) 205 U.S. 187, 193 [51 L.Ed. 764, 767, 27 S.Ct. 480] ["there is an obligation on all persons to take the care which, under ordinary circumstances of the case, a reasonable and prudent man would take"]; *Fouch v. Werner* (1929) 99 Cal.App. 557, 565 [279 P. 183] [standard of care is "the standard of an ordinarily prudent man under normal circumstances"].)

■ The common law does not take account of a person's mental capacity when determining whether he has acted as the reasonable person would have acted. The law holds "the mentally deranged or insane defendant accountable for his negligence as if the person were a normal, prudent person." (Prosser & Keeton, Torts (5th ed. 1984) § 32, p. 177.)

California criminal law reflects this principle by prohibiting the defendant from proving insanity in the same trial where guilt is established. The defendant is presumed sane in the guilt trial. He raises the defense of insanity by separate plea, and the issue is decided in a separate trial. (§ 1026.) Evidence of defendant's mental condition is not admissible to prove the absence of general intent. (*People v. Gutierrez* (1986) 180 Cal.App.3d 1076, 1082 [225 Cal.Rptr. 885].)

The principle is similarly continued in the law of self-defense. In *People v. Humphrey, supra*, 13 Cal.4th 1073 (*Humphrey*), the Supreme Court determined expert testimony concerning battered women's syndrome was relevant and admissible under Evidence Code section 1107 to establish the objective reasonableness of defendant's belief in the necessity to kill the victim. (13 Cal.4th at pp. 1076–1077.) Defendant erroneously claims *Humphrey* required

the admission here of his mental condition as part of establishing the reasonable person standard. Nowhere did the *Humphrey* court state the expert evidence could be used to redefine the "reasonable person" standard as one who suffered from battered women's syndrome or, as defendant argues here, one who suffered from hearing voices.

To the contrary, the Supreme Court stated: "[W]e are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard. Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' Evidence Code section 1107 states 'a rule of evidence only' and makes 'no substantive change.' (Evid. Code, § 1107, subd. (d).) The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the *jury*, not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable." (*Humphrey, supra,* 13 Cal.4th at p. 1087, italics in original.)

Here, the guilt phase jury knew defendant was an inmate at New Folsom Prison's psychiatric services unit; he was incarcerated for committing a homicide and a number of robberies; he was being involuntarily medicated; he heard "powerful" female voices every day telling him the staff is poisoning his food and saying things about his family; before each incident, the voices told him the correctional officers were going to hurt him; and he believed he had no choice but to follow the voices and do what he did. The jury also knew the facts of the incidents, and knew it had no evidence of any attempt by, or intent of the officers to harm defendant.

■ The jury thus had before it all of the relevant facts and circumstances in which defendant found himself. The trial court correctly denied defense counsel's efforts to define the reasonable person as a mentally ill person hearing voices. Under the rule of *Humphrey*, the jury was to determine whether a person of ordinary and normal mental and physical capacity would have believed he was in imminent danger of bodily injury under the known circumstances. The jury was so instructed, and defendant was not denied the opportunity to present his defense in the manner allowed by law.

II–IV[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 22, 2004. George, C. J., did not participate therein.

---

[*]See footnote, *ante*, 508.