Filed 4/12/21  P. v. James CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072459 |
| v. | (Super.Ct.No. RIF1880195) |
| CORY CHENNO JAMES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge. Affirmed.

Edward Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Cory Chenno James of assault with a semiautomatic firearm and found true the allegations that he personally used a firearm in committing the offense and

1

that he inflicted great bodily injury. (Pen. Code, §§ 245, subd. (b), 12022.5, subd. (a), 12022.7, subd. (a).) James was sentenced to 22 years in state prison.

On appeal, James argues that the trial court erred by (1) sustaining certain evidentiary objections, (2) not allowing James to present evidence that he suffered from posttraumatic stress disorder (PTSD) to demonstrate the objective reasonableness element of his self-defense claim, and (3) allowing a law enforcement officer to opine that one of the victim's friends was not involved in the shooting. James further argues that the prosecutor's question eliciting the law enforcement officer's opinion constituted misconduct. James contends that these errors were cumulatively prejudicial. We conclude that James has not shown prejudicial error, and we therefore affirm the judgment.

## BACKGROUND

A. *The Conflict*

Sometime in 2014, John Doe was in a romantic relationship with Kay J.[1] While they were together, Kay became pregnant. Doe believed the child was his and was present with Kay in the hospital in July 2015 when the child was born. After the child was born, Doe ended the relationship with Kay.

When the child was conceived, Kay was also involved with James. While Kay was pregnant, she was unsure which man was her child's father. Kay and James stopped

---

[1] We refer to the victim by a fictitious name and omit the last names of the witnesses to preserve their anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

2

dating several months before the child was born. James was the child's father. Sometime after the child was born, Kay and James resumed their relationship. According to Kay, it upset James that Doe had been present for the child's birth. Kay never introduced James and Doe to each other.

In February 2016, James and Kay, along with their infant child and a three-year-old child of James's, drove past a bus terminal where Doe happened to be hanging out with several friends, including Anthony T. and Vincent I. James drove into the bus terminal's parking lot, exited his vehicle, and walked over to Doe. James confronted Doe and twice asked Doe if he in fact was John Doe, which Doe initially denied. James turned to walk away and Doe asked, "'What if my name is [John Doe]?'" James stayed, and the two men talked in a "pretty aggressive" manner.

Anthony got involved and told James that he needed to leave. According to Doe, both Anthony and Vincent were willing to engage in violence on Doe's behalf. Anthony asked Doe if Doe wanted him to hit James, but Doe had already told Vincent that he should not engage in any physical violence because the bus terminal was located in front of a police station. According to Doe, he, Anthony, and Vincent were not armed, and none of them threatened to shoot James's vehicle.

As the argument between Doe and James continued, Doe believed it was leading to a physical fight, which he did not want to occur at the bus terminal. Doe suggested that the men relocate to a nearby park, where he wanted to fight James. James agreed to the meeting. Before James drove away from the bus terminal, Doe thought that James

3

might have said "something about airing [Doe] out," which Doe understood to mean shooting Doe.

B.       *The Fist Fight and the Shooting*

James and Kay ran a brief errand, and James then drove to the park. James parked on a street near the park, immediately exited the vehicle, and headed into the park. Kay exited the vehicle and entered the park shortly after James. Walking some distance behind James, Kay noticed for the first time that James was holding a gun in his hand. Kay did not see James retrieve the gun from anywhere inside the car at any point that day. She thus believed that James had the gun with him at the bus terminal even though she did not then see the gun. Kay was briefly outside the vehicle between leaving the bus terminal and arriving at the park.

Doe was already at the park when James arrived. While seated at a bench, Doe saw James enter the park and run toward Doe while crouching. Doe thought that James appeared to be carrying a weapon, so Doe got up, ran toward a fence, and jumped to the top. While atop the fence, Doe told James that he would fight James if James put the weapon away. James put the gun in Kay's purse, which was hanging on her shoulder.

Once James was no longer holding the gun, Doe came down from the fence, and the two men approached each other and started to fight. Doe pulled James to the ground, and James's head struck the ground. James ended up on top of Doe while the men continued fighting on the ground, and, according to Kay, James started "getting the best

4

of [Doe]." Several witnesses testified that the man who was on top of the other man on the ground called out for someone to give him a gun.

Doe said that he was somehow able to get up from the ground, and James then ran toward Kay and demanded that Kay give him his gun. After James asked Kay for the gun, Doe started running away. James retrieved his gun from Kay's purse and started firing in Doe's direction. Afraid of James, Kay ran away too. James fired four shots. One of the bullets struck Doe in the back of the head. Doe testified that when he was on the ground fighting with James, Doe did not threaten to shoot James and did not ask any of his friends to shoot James.

Law enforcement officers, including Detective Mike Medici, responded to the scene. Detective Medici became the case agent for the incident. In that capacity, he reviewed all of (1) the reports generated in the case, (2) the physical evidence in the case, (3) the witness statements, and (4) the video recordings from a security camera at a senior center near the park and from witness's cell phones. He also interviewed Doe, Kay, and some other witnesses.

In his testimony at trial, Detective Medici identified the video recordings that he had reviewed, the prosecutor then asked him: "At any point was this individual, [Vincent]—at any point was this person—seemed to get involved in that shooting?" Detective Medici responded, "[n]o," and he then confirmed in response to the following question that, "based on reviewing the videos," he at no point felt it necessary to locate or to interview Vincent. Nothing from the investigation Detective Medici conducted on the

5

day of the incident led Detective Medici to "focus in on" Vincent. He did not focus on Vincent because there was no evidence that Vincent had been involved in the fight. Detective Medici explained, "You saw it on the video. [Vincent] wasn't anywhere in eye shot."

C.     *Defense Case*

James did not deny shooting Doe. The defense theory was that James acted in self-defense or in defense of others.

1. *Doe's Friend Testifies for the Defense*

Anthony testified on James's behalf. Anthony claimed that both he and Vincent threatened James when James confronted Doe at the bus terminal. Anthony said that he was going to "whup [James's] ass." Vincent threatened that he was going to "shoot . . . up" James's car and warned that he did not care who was in it. According to Anthony, Vincent had a gun in his front right pocket. Anthony was not at the park when the fight occurred but arrived afterward and was interviewed by the police that day.

Because of his friendship with Vincent, Anthony did not report to police that Vincent had threatened to shoot James's car earlier in the day or that Vincent had a gun. Over two years later, Anthony spoke with an investigator for the prosecution and told the investigator that Doe had threatened to shoot James's car at the bus terminal. At James's first trial approximately two weeks later, Anthony testified that it was Vincent, not Doe, who had made the threat. He also testified that he did not know who had made the threat. He further testified that he never saw a gun on the day of the shooting.

6

2. *Defendant's Testimony*

James testified on his own behalf. When James pulled into the bus terminal parking lot on the day of the shooting, he wanted to have a "cordial conversation" with Doe to ask Doe to leave him and Kay alone. James asked Doe to stop texting Kay. James kept his hands behind his back during the conversation in order to be nonconfrontational. James had a gun in the car. Anthony threatened to beat up James. Vincent said, "I'll pop your bitch ass," which James understood to be Vincent threatening to shoot James. James told Vincent that James was "not here for that" and that his gun was in the car. James noticed a bulge in Vincent's right pocket, which he believed was the outline of a gun. Vincent threatened to shoot James twice that day. James agreed to meet Doe at the park with the intention of fighting.

James brought his nine-millimeter semiautomatic handgun with him into the park because he and his family had just been threatened, which James described as Vincent or Doe "saying [he was] going to shoot up the car with my kids in it." When James arrived at the park, he noticed that Vincent was there. Doe ran away and jumped onto a fence when he saw James approaching, and Doe told James that he would fight if James put his gun away. James put his gun in Kay's purse and told her something like "Stay right here or go back to the car." James then walked toward Vincent and Doe and overheard them conversing. On the basis of what he overheard, James believed that if James was winning in a "one-on-one" fight with Doe then Vincent "might hop in it or something."

7

James believed that he had the opportunity to walk away but stayed to fight because he and his family had been threatened.

James punched Doe first. Within five seconds, Doe was down on the ground and James was on top of him. James believed he was winning the fight. James heard Doe "yell out for [Vincent] to bust on [James]," which James understood to mean that Doe wanted Vincent to shoot James. James attempted to get up but Doe held him down. James believed that he was going to get shot by Vincent if James could not get away. James eventually got free, ran over to Kay, and retrieved his gun from her purse so that he "wouldn't get shot."

James started firing immediately because he believed that he "would have died" if he did not. James noticed that Doe ran toward Vincent and thought that Doe intended to get Vincent's gun. James fired four shots. He claimed that he had aimed high and was not aiming at anyone in particular or toward a particular location. Doe did not make it to Vincent and did not possess a gun.

After James fired the four shots, he and Kay ran to their vehicle, and Kay drove them away from the park. When James ran away, he did not realize that Doe had been shot. James instead believed that Doe had fallen and that the threat to James "was neutralized." Although Vincent was the only person whom James believed possessed a gun other than James, James did not fire toward Vincent because "[Vincent] ducked after [James] fired at [Doe]." When James fired his weapon, he was in fear for his own life and Kay's life.

8

James confirmed that no one else who testified said that they heard Doe tell Vincent to shoot James. James told law enforcement officers numerous lies about what happened that day, including initially reporting that he was not armed on the day of the shooting.

## DISCUSSION

A. *Evidence of PTSD*

James argues that the trial court erred by preventing him from presenting expert testimony that he suffered from PTSD, which he claims was relevant to the objective reasonableness element of his self-defense claim.[2] We conclude that the trial court did not abuse its discretion.

Before trial, James moved to introduce testimony from a mental health expert that James suffered from PTSD as a result of his combat experience. James argued that the evidence was relevant to the jury's determination of the reasonableness of his belief that he needed to use immediate force in response to an imminent threat of danger. The People argued that the evidence was inadmissible under Evidence Code section 352 (unlabeled statutory references are to this code). Relying on *People v. Jefferson* (2004)

---

[2] For the first time in his reply brief, James contends that the evidence that he suffered from PTSD also was relevant to whether he subjectively feared for his life. James did not make that argument in the trial court, so we do not consider it. (*People v. Williams* (1997) 16 Cal.4th 153, 250 (*Williams*).)

9

119 Cal.App.4th 508 (*Jefferson*), the trial court excluded the testimony, concluding that it was "not admissible for the purpose of self defense."**3**

"'To justify an act of self-defense for [an assault charge under Penal Code section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) "In other words, the defendant's belief must both subjectively exist and be objectively reasonable." (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014 (*Brady*).) "To assess whether a belief was objectively reasonable, 'a jury must consider what "would appear to be necessary to a reasonable person in a similar situation and with similar knowledge."'" (*Ibid.*) The jury "must assume '"the point of view of a reasonable person in the position of [the] defendant,"' taking into account '"all the elements in the case which might be expected to operate on his mind."'" (*Ibid.*)

We review for abuse of discretion a trial court's exclusion of expert testimony. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) "A trial court will not be found to have abused its discretion unless it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice."" (*People v.*

---

**3** The trial court also later excluded the testimony of a lay witness who served with James in the military, which was offered to demonstrate that James was in combat while he served in the military. The trial court concluded that the evidence was not relevant and also excluded it under the "probative value analysis." In the section of the opening brief challenging the trial court's exclusion of evidence that James suffered from PTSD, James describes the trial court's ruling excluding this lay witness testimony. He does not, however, make any argument specific to this testimony or about the two legal grounds on which the trial court excluded it. We therefore consider any challenge to exclusion of the lay witness testimony forfeited. (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544, fn. 8 (*Ben C.*).)

*Hajek and Vo* (2014) 58 Cal.4th 1144, 1180, abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

In *Jefferson*, *supra*, 119 Cal.App.4th 508, the defendant was convicted of several counts of battery against correctional officers while he was housed in a prison psychiatric unit. (*Id.* at p. 510.) He argued that "the trial court erred in not admitting evidence of his mental illness during the trial's guilt phase for purposes of establishing the 'reasonable person' standard in support of his defense of self-defense." (*Id.* at pp. 516, 518.) The Court of Appeal concluded that the trial court had properly excluded the evidence. (*Id.* at p. 520.) The Court of Appeal explained that the issue for the objectively reasonable person test "is not whether [the] defendant, or a person like him, had reasonable grounds for believing he was in danger," but instead "is whether a 'reasonable person' in [the] defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm." (*Id.* at p. 519.) The court further explained: "By definition, a reasonable person is not one who hears voices due to severe mental illness." (*Ibid.*) Instead, "[t]he reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be." (*Ibid.*)

In reaching its conclusion, *Jefferson*, *supra*, 119 Cal.App.4th 508 analyzed *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*) and explained why *Humphrey* did not support the defendant's position. (*Jefferson*, at pp. 519-520.) In *Humphrey*, our Supreme Court held that under section 1107 expert testimony concerning battered women's

11

syndrome was relevant and admissible to establish the objective reasonableness of the defendant's belief that she needed to kill in self-defense. (*Humphrey*, *supra*, at pp. 1086-1087.) Section 1107 is a rule of evidence that under specified circumstances makes expert testimony "admissible by either the prosecution or the defense regarding intimate partner battering and its effects." (§ 1107, subd. (a).) As pointed out in *Jefferson*, *Humphrey* rested its decision on section 1107 and expressly declined to express any opinion "on the admissibility of expert testimony regarding other possible syndromes in support of a claim of self-defense." (*Humphrey*, at p. 1087; *Jefferson*, at p. 520.) For example, the Supreme Court cautioned that the "decision would not, in another context, compel adoption of a '"reasonable gang member" standard.' [Section 1107] states 'a rule of evidence only' and makes 'no substantive change'" to the law of self-defense. (*Humphrey*, at p. 1087.)

James does not argue that *Jefferson*, *supra*, 119 Cal.App.4th 508 is factually distinguishable or was wrongly decided. He acknowledges that *Jefferson*'s approach to the objective reasonableness standard for self-defense was followed in *Brady*, *supra*, 22 Cal.App.5th at pages 1015, 1018, another appellate opinion explaining that the holding in *Humphrey* is narrow. (*Brady*, at pp. 1015-1016.) Relying on *People v. Herrera* (2016) 247 Cal.App.4th 467 (*Herrera*) and *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 (*Sotelo-Urena*), James claims that there is a split of authority regarding the admissibility of evidence of a defendant's mental condition to establish how the defendant "perceived and responded to events at the time."

12

James's reliance on *Herrera*, *supra*, 247 Cal.App.4th 467 is misplaced.  In *Herrera*, the claimed error was the exclusion of expert testimony on how the defendant's mental illness affected his mental state at the time of the killing; the defendant argued that the testimony was relevant to show that he did not harbor the requisite malice and did not premeditate or deliberate.  (*Id.* at p. 477.)  *Herrera* agreed that exclusion of the testimony was error and, in its prejudice analysis, included one sentence concerning the potential relevance of the testimony to the defendant's claim of self-defense.  (*Id.* at p. 478.)  The court reasoned:  "'The [trial] court's ruling also prevented the jury from properly evaluating evidence that would have been relevant to its consideration of the self-defense, imperfect self-defense and heat of passion instructions given here.'"  (*Ibid.*)  That is all that *Herrera* had to say about the relation between mental health evidence and a defendant's claim of self-defense.  *Herrera* did not analyze the admissibility of evidence of a defendant's mental illness for the purpose of demonstrating the objective reasonableness element of self-defense.  "It is, of course, 'axiomatic that a decision does not stand for a proposition not considered by the court.'"  (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 217.)

In contrast, *Sotelo-Urena*, *supra*, 4 Cal.App.5th 732, relied on *Humphrey*, *supra*, 13 Cal.4th 1073 and concluded that expert testimony about the effect of chronic homelessness, which the defendant had experienced, was relevant to the objective reasonableness element of the defendant's claim of self-defense.  (*Sotelo-Urena*, at pp. 750-752.)  *Sotelo-Urena* reasoned that the same principles underlying the Supreme

Court's decision in *Humphrey* applied to "expert testimony explaining why a chronically homeless individual would experience a heightened fear of aggression," which "would assist a jury in weighing the reasonableness of defendant's belief of imminent harm, as was central to [the] defendant's self-defense claim." (*Sotelo-Urena*, at p. 751.)

More recently, another Court of Appeal has cautioned that *Sotelo-Urena* should be narrowly interpreted along with *Humphrey*. (*Brady*, *supra*, 22 Cal.App.5th at p. 1016.) According to *Brady*, "*Sotelo-Urena* is better read as concluding that expert testimony regarding chronic homelessness could bear on the issue of reasonableness by showing that, due to the greater incidence of violence toward homeless persons, 'a [homeless individual] might become sensitized and thus able reasonably to discern when danger is real and when it is not.'" (*Brady*, at p. 1016, quoting *Humphrey*, *supra*, 13 Cal.4th at p. 1086.)

We agree with the analysis and conclusion in *Jefferson*, *supra*, 119 Cal.App.4th 508 and *Brady*, *supra*, 22 Cal.App.5th 1008. The holding in *Humphrey*, *supra*, 13 Cal.4th 1073 is narrow and does not authorize admission of evidence that James suffered from PTSD to prove the objective reasonableness element of his self-defense claim. We therefore conclude that the trial court did not abuse its discretion by excluding the expert testimony that James suffered from PTSD.

B.     *Lay Opinion Testimony of Detective Medici*

After confirming that Detective Medici had reviewed all of the physical evidence, the case reports, the witness statements, and the video recordings related to the shooting,

the prosecutor asked Detective Medici, "Based on reviewing all of that, all the reports, all the videos, all the physical evidence, is there any evidence to support that [Vincent] was involved in any way?" Defense counsel objected based on speculation and lack of foundation, and the trial court indicated that the question also called for hearsay. The trial court invited counsel to argue the issue in chambers.

Outside of the presence of the jury, the trial court expressed concern that Detective Medici opining about Vincent's involvement on the basis of witness statements would be hearsay. Defense counsel argued that it was "improper for a prosecutor to ask an experienced homicide detective to tell a jury that a person was or was not involved." The court agreed, explaining that the question would not be allowed because it called for a conclusion. The prosecutor argued that the questions were relevant because defense counsel had "essentially brought up that photograph [of Vincent] numerous times to say that that person had a gun, that person was involved in this, had made some threats." The trial court explained that the question of whether Vincent was involved in the shooting calls for hearsay because Detective Medici could form such an opinion only by "gathering that information from other witnesses." The court explained that Detective Medici would be allowed to "describe what was in the video," including whether Detective Medici saw Vincent in the recordings. The trial court cautioned that Detective Medici's "conclusion that [Vincent] was involved or not involved in a crime, I think we're getting a little shaky there."

After the chambers conference, the prosecutor resumed questioning Detective Medici, who identified the specific video recordings he had reviewed. Detective Medici also identified Vincent in one of the cell phone video recordings. After the questions about the video recordings, the prosecutor asked: "At any point was this individual, [Vincent]—at any point was this person—seemed to get involved in that shooting?" Defense counsel objected on the basis of vagueness, and the trial court overruled the objection. Detective Medici answered the question in the negative. Detective Medici then testified that on the basis of his review of the video recordings he did not feel that it was necessary to locate or to talk to Vincent. On cross-examination, Detective Medici testified that during the course of the investigation he had never identified Vincent. After eliciting that testimony, defense counsel asked Detective Medici, "[A]s far as watching this video, all the other videos, and all the other interviews you conducted, you never focused in on [Vincent], did you?" Detective Medici responded that he had not focused on Vincent.

James argues that the trial court impermissibly allowed Detective Medici "to testify that based on his review of the videos [Vincent] was not involved in the shooting," which James claims was not of any assistance to the jury.[4] James further argues that the prosecutor's question eliciting this testimony amounted to misconduct because it violated

---

[4]     James also argues that "[t]o the extent that [Detective] Medici relied upon materials which were not admitted into evidence in forming his opinion this was hearsay and inadmissible." James did not make that argument in the trial court, so we do not consider it. (*Williams*, *supra*, 16 Cal.4th at p. 250.)

the trial court's proscription against asking a question about whether Vincent was involved. We are not persuaded by either argument.

Lay witness opinion testimony is admissible when it is rationally based on the witness's perception and helpful in providing a clear understanding of the witness's testimony. (§ 800, subds. (a) & (b); *People v. DeHoyos* (2013) 57 Cal.4th 79, 130 (*DeHoyos*).) If an investigating law enforcement officer's testimony meets those requirements, then the officer may provide lay witness testimony about the significance of evidence in a case when the subject of the officer's opinion is not "so far 'beyond [the] common experience' that expert testimony [is] required." (*People v. Lewis* (2008) 43 Cal.4th 415, 504, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920; *People v. Maglaya* (2003) 112 Cal.App.4th 1604, 1609 [officer's lay witness testimony about a shoeprint was helpful to understanding the remainder of the officer's testimony].) We review for abuse of discretion the trial court's admission of lay opinion testimony. (*People v. Sanchez* (2016) 63 Cal.4th 411, 456.)

James relies on *People v. Torres* (1995) 33 Cal.App.4th 37 (*Torres*) for the proposition that a law enforcement officer cannot testify about "a person's involvement or non involvement in an incident." *Torres* does not stand for that far-reaching proposition. In *Torres*, the court concluded that the officer had improperly provided an expert opinion "as to the meaning of the terms robbery and extortion and [expressed] the opinion the crimes committed in th[at] case were robberies" and thus opined as to the ultimate fact at issue—that the defendant had committed felony murder. (*Id.* at pp. 47-

17

48.) *Torres* is inapplicable because it involved the admissibility of expert testimony. (*Id.* at pp. 43-45.)

James did not object in the trial court to Detective Medici's testimony about James's lack of involvement on the ground that the testimony was an improper subject of expert opinion. It is unclear whether James is arguing on appeal that the evidence was improperly admitted as expert testimony. In his opening brief, James cites section 801, the statutory provision governing admission of expert testimony, and cites *Torres*, *supra*, 33 Cal.App.4th at page 45, for the proposition that "'[o]pinion testimony may be admitted in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience.'" That is the relevant standard for admitting expert opinion. (§ 801, subd. (a).) In his opening brief, James does not otherwise identify the specific basis of his challenge to Detective Medici's testimony. Because James did not object at trial to Detective Medici's testimony on the ground that it was improper expert testimony, James has forfeited that objection. (*People v. Navarette* (2003) 30 Cal.4th 458, 507 [evidentiary issue forfeited if not raised at trial]; *Williams*, *supra*, 16 Cal.4th at pp. 208-209 [same].)

Detective Medici opined about whether Vincent "seemed to get involved in [the] shooting," and James concedes that the opinion was expressly based on Detective Medici's "review of the videos." In his reply brief, James does not dispute that Detective Medici's testimony was rationally based on his personal observations of the video recordings of the shooting. The jury also viewed the video recordings on which

18

Detective Medici relied and thus was able to draw its own conclusions from the recordings. But Detective Medici's testimony was nevertheless helpful to provide the jury a better understanding of why Detective Medici did not find it necessary either to locate or to interview Vincent about the shooting and did not otherwise focus on Vincent in investigating the shooting. Given that Detective Medici's opinion was rationally based on his own perception of the videos and was helpful to the jury by providing a better understanding of his testimony, we conclude that the trial court did not abuse its discretion by allowing Detective Medici to opine as a lay witness about Vincent's lack of involvement in the shooting.[5]

We also reject James's argument that the prosecutor's question about whether Vincent was involved in the shooting amounted to misconduct because it violated the trial court's ruling against eliciting such testimony. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not

---

[5] In his reply brief, James argues for the first time that Detective Medici's testimony that Vincent was not involved "asked for a legal conclusion" if it was "based on everything [Detective] Medici reviewed," rather than on the video recordings alone. The argument contradicts James's argument in his opening brief, in which James acknowledged that Detective Medici's opinion about Vincent's apparent lack of involvement was "based on [Detective Medici's] *review of the videos*." (Italics added.) In general, we consider an argument made for the first time in a reply brief forfeited absent a showing of good cause. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.) "Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . ." (*Ibid.*) The People responded to the argument made in the opening brief and argued that "[t]he trial court properly admitted [Detective] Medici's testimony about [Vincent] because [Detective] Medici opined *on his personal review of* [*the*] *video footage of the incident*, and his perception[s] of the evidence helped the jury understand his decision-making as the case agent in the investigation." (Italics added.) Because James has not demonstrated good cause for his failure to raise his new argument earlier, we consider the argument forfeited.

waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).) James argues that an objection to that question would have been futile because his objections to the same question on other grounds were overruled. (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 237 [discussing the futility exception to failing to object to prosecutorial misconduct].) Assuming for the sake of argument that an additional objection to the question would have been futile, James's argument still fails because any error was harmless. "Reversal of a judgment of conviction based on prosecutorial misconduct [under state law] is called for only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to a defendant would have occurred absent the misconduct." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)[6]

The trial court ruled that the prosecutor could not ask Detective Medici about Vincent's involvement in the shooting because "I'm sure he's gathering that information from other witnesses." The prosecutor was given latitude to ask Detective Medici to describe what he saw on the video recordings. The prosecutor then questioned Detective Medici about whether Vincent "seemed to get involved in that shooting."

But Detective Medici also testified without any objection that "there was no evidence that [Vincent] was involved." He further testified on direct examination and

---

[6] We later address James's argument about the cumulative prejudicial effect of the alleged errors, but we first analyze the prejudicial effect of each error separately before we look at the prejudicial effect of the errors cumulatively. (*People v. Woodruff* (2018) 5 Cal.5th 697, 783; *People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

20

redirect examination without any objection that he did not focus on Vincent in the investigation. In addition to the testimony elicited by the prosecutor, defense counsel asked Detective Medici if he had focused on Vincent on the basis of "this video, all the other videos, and all the other interviews you conducted." Given the amount of similar testimony that was admitted without objection, including testimony elicited by defense counsel, there is no reasonable probability that the jury would have reached a result more favorable to James absent the alleged error. (*People v. Johnson* (2019) 8 Cal.5th 475, 518 [presumed error harmless in light of similar evidence admitted]; *Perumean v. Wills* (1937) 8 Cal.2d 578, 583 [same].) We therefore conclude that any error in allowing the prosecutor to question Detective Medici about James's involvement was harmless.

C.      *Sustained Evidentiary Objections Based on Relevance*

James argues that the trial court abused its discretion by ruling that testimony on two issues was irrelevant and hence inadmissible. We find any error harmless.

Only relevant evidence is admissible. (§ 351.) Relevant evidence includes "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) "'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'" (*People v. Harris* (2005) 37 Cal.4th 310, 337 (*Harris*).) "The trial court has broad discretion in determining the relevance of evidence." (*Ibid.*)

We review for abuse of discretion the trial court's ruling on the admissibility of evidence. (*Ibid.*)

First, James contends that the trial court improperly excluded testimony that James was carrying a gun on the day of the shooting for self-defense because James had previously been the victim of an unrelated shooting. The trial court excluded the testimony as irrelevant and also under section 352, explaining that such evidence was "not probative" and "also prejudicial." James challenges the trial court's conclusion that the evidence was not relevant. If that conclusion was erroneous, the error would affect the analysis under section 352—relevant evidence has more probative value than irrelevant evidence. But James does not make that argument or in any way challenge the trial court's exclusion of the testimony under section 352. He has therefore forfeited any challenge to the trial court's exclusion of the evidence under section 352. (See *Ben C.*, *supra*, 40 Cal.4th at p. 544, fn. 8.) We consequently need not and do not analyze whether the trial court erred by determining that the evidence was not relevant. The trial court's exclusion of the testimony under section 352 would remain unchallenged regardless of any other error.

Second, James argues that the trial court improperly excluded testimony that Anthony thought James looked nervous when Vincent threatened to shoot James at the bus terminal. After Anthony testified that during the confrontation at the bus terminal Vincent threatened to shoot James's car, defense counsel asked, "Did Mr. James appear to be nervous?" The trial court sustained the prosecutor's relevance objection. James

22

contends that the ruling was erroneous because James's purportedly nervous appearance "immediately after this threat was made suggested that he took this threat seriously" and thus was relevant to James's claimed belief that he needed to use deadly force to defend himself at the park. We agree. The entire theory of James's case was that he feared for his life because he believed that Vincent was armed at the park, which James claimed to have learned from the confrontation at the bus terminal. How Vincent's threat at the bus terminal affected James was relevant to how James later perceived his circumstances at the park when he realized that Vincent was present. The trial court therefore erred by excluding Anthony's testimony about whether James appeared nervous when threatened by Vincent at the bus terminal.

The error was not prejudicial, however. It is not reasonably probable that a different outcome would have resulted if Anthony had been allowed to answer the question and answered that James appeared nervous. (*People v. McDaniel* (2019) 38 Cal.App.5th 986, 1005 ["Evidentiary errors under state evidence rules are evaluated under the 'reasonable probabilit[y]' standard of prejudice announced in [*Watson*]"].) Anthony's testimony that James appeared nervous would have added credibility to James's testimony that he was fearful because James believed that Vincent was armed at the park. Although James's reaction to the threat at the bus terminal was relevant to his later perception of what happened at the park, it was Doe's command for Vincent to shoot James and James's belief that Vincent was armed that caused James to retrieve his own weapon and shoot. Moreover, Anthony corroborated James's testimony that

23

Vincent was armed that day and threatened to shoot James's vehicle with James's family inside it. James testified that his fear when he fired his weapon was based on Doe telling Vincent to "bust on" James, James's belief that Vincent was armed, and the prior threat Vincent made at the bus terminal. Given all of that evidence, testimony from Anthony that James appeared nervous when Vincent threatened him at the bus terminal would not have added significantly to the probative weight of the evidence supporting James's claim that he acted in self-defense when he shot Doe later at the park. It consequently is not reasonably probable that James would have obtained a more favorable outcome if Anthony had testified that James appeared nervous when Vincent threatened James at the bus terminal. We therefore conclude that the error in excluding Anthony's testimony was harmless.

D.    *Sustained Evidentiary Objections Based on Hearsay*

James argues that the trial court improperly sustained two evidentiary objections on the basis of hearsay. We find any error harmless.

"Hearsay may be briefly understood as an out-of-court statement offered for the truth of its content." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; § 1200, subd. (a).) "Hearsay is generally inadmissible unless it falls under an exception." (*People v. Sanchez*, *supra*, at p. 674; § 1200, subd. (b).) We review for abuse of discretion the trial court's exclusion of evidence as hearsay. (*DeHoyos*, *supra*, 57 Cal.4th at p. 132.)

24

1.  *Effect on the Listener*

James argues that the trial court erred by excluding James's testimony about the conversation he overheard between Vincent and Doe at the park before the fight. He contends that the statements between Vincent and Doe were not offered for their truth but instead for the nonhearsay purpose of demonstrating their effect on James. After James put his gun in Kay's purse, he overheard Doe and Vincent talking with one another. The trial court sustained the prosecutor's hearsay objection to defense counsel's question about the contents of the conversation. Defense counsel proffered that the statements were being offered "for the impact on the listener, and it's critical to the defense in this case." Unable to inquire about the contents of the conversation, defense counsel asked James how the conversation between Doe and Vincent made him feel. James answered, "It made me feel like it was going to be a one-on-one, and if I was winning, [Vincent] might hop in it or something."

"[A]n out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*People v. Montes* (2014) 58 Cal.4th 809, 863 (*Montes*).) "The nonhearsay purpose must also be relevant to an issue in dispute." (*Ibid.*)

The content of the conversation between Doe and Vincent before the fight was probative of James's belief that he was in imminent danger of harm when Doe allegedly yelled out for Vincent to "bust on" James. The People claim that the statements were

25

offered for the truth of the matter asserted because James admitted that he could have departed after hearing the conversation and did not dispute that he later got his gun and shot at Doe. Thus, the People argue that James's "reaction to the statement was not the relevant fact sought to be proved by admission" of the conversation. The argument fails because it does not show that the testimony was not relevant for the nonhearsay purpose of proving that James believed he was in danger. When Doe allegedly told Vincent to "bust on" James, Doe was losing the fight. According to James, the contents of Doe's earlier conversation with Vincent included instructions for what Vincent should do if Doe was losing. How that conversation impacted James therefore was admissible for the nonhearsay purpose of showing that "it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*Montes*, *supra*, 58 Cal.4th at p. 863.) The trial court erred by excluding the testimony.

The error was not prejudicial, however, because it is not reasonably probable that James would have obtained a more favorable result if the testimony had been admitted. (*Seumanu*, *supra*, 61 Cal.4th at p. 1308 [*Watson* standard applies to admissibility determination concerning hearsay evidence].) The testimony about the contents of the conversation would at most have bolstered James's testimony about why he was afraid when he heard Doe tell Vincent to "bust on" James. Although James was not permitted to recount what Vincent and Doe allegedly said to each other, James was permitted to testify about the effect the conversation had on him, including his inference that Vincent

26

would "hop in it" if Doe was losing the fight.  Thus, although the exact words spoken between the men were not admitted, the gist of the conversation was relayed through James's testimony about how it made him feel.  (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 415 [any error in admitting hearsay statement was harmless given that another witness's "statements conveyed the same information"].)  Given that testimony, the jury could reasonably infer that James believed that Vincent would assist Doe in the fight.  In light of James's testimony that during the fight Doe told Vincent to "bust on" James, the jury further could reasonably infer that the assistance Vincent and Doe discussed before the fight involved Vincent shooting James.  In addition, James repeatedly testified that he fired his weapon because he considered both Doe and Vincent to be threats to his life because Vincent possessed a weapon.  In sum, we conclude that any error in excluding the contents of the pre-fight conversation between Vincent and Doe was harmless in light of the other evidence admitted, including James's testimony conveying how the conversation affected him.

2.  *Prior Inconsistent Statement*

Doe testified that neither he, Anthony, nor Vincent threatened to shoot at James's vehicle at the bus stop.  When Anthony testified for the defense, however, he claimed that Vincent did threaten to shoot at James's vehicle at the bus stop.  Anthony also testified that since the shooting, he had twice spoke with Doe about the incident, including "about the threats that were made against Mr. James at the bus stop."  Defense counsel then asked Anthony, "Did [Doe] acknowledge to you that somebody threatened to shoot Mr.

James's car at the bus stop?"  The prosecution objected on the basis of hearsay, the defense argued the answer would be admissible as a prior inconsistent statement, and the court sustained the objection.  James argues that the trial court's ruling was erroneous.  We disagree.

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing . . . ."  (§ 1235.)  "Prior inconsistent statements are admissible under this provision to prove their substance as well as to impeach the declarant."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Assuming that Anthony would have testified that Doe acknowledged that somebody threatened to shoot at James's car, that testimony would not have been admissible as a prior inconsistent statement because it was not inconsistent with Doe's testimony that neither he, Anthony, nor Vincent threatened to shoot at James's vehicle.  Doe did not testify that *nobody* threatened to shoot at James's vehicle, so his alleged later acknowledgement that "somebody" made such a threat is not inconsistent.  Thus, any direct answer to the question at issue would have been consistent with Doe's prior testimony.  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1220 [testimony was not "necessarily inconsistent" with the witness's prior statement; the prior statement was erroneously admitted].)  The trial court therefore did not abuse its discretion by sustaining the hearsay objection.

E.       *Cumulative Error Not Prejudicial*

James contends that the cumulative effect of the errors he has identified deprived him of his constitutional right to a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence.'" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646; *People v. Holt* (1984) 37 Cal.3d 436, 458 [applying *Watson* standard to determining prejudicial impact of cumulative error].) "The 'litmus test' for cumulative error 'is whether [the] defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have identified two evidentiary errors and one potential instance of prosecutorial misconduct:  (1) exclusion of Anthony's testimony about whether James appeared nervous when threatened at the bus terminal, (2) exclusion of the content of the conversation James said he overheard between Doe and Vincent, and (3) the prosecutor's asking a question that may have been prohibited by the trial judge's prior ruling.  All of those errors affected James's ability to present a complete defense to some extent.  Their prejudicial impact was minimal, however, when they are considered in light of the ample evidence that James presented supporting his claim that he acted in self-defense at the park, particularly the admitted evidence that was similar to the evidence that was erroneously admitted or excluded.  For example, Detective Medici testified on cross-examination that there was no evidence that Vincent was involved in the shooting, and

29

James testified that the conversation between Doe and Vincent at the park led him to believe that Vincent would intervene if Doe was losing the fight. In addition, although Anthony's testimony about whether James appeared nervous when Vincent threatened him earlier was relevant, it would not have added much to James's claim that he acted in self-defense when he shot Doe later at the park in response to a different threat from Doe.

For all of these reasons, we conclude that "there is no reasonable possibility that the jury would have reached a different result . . . absent any or all of the assumed errors." (*People v. Masters* (2016) 62 Cal.4th 1019, 1079; *People v. Stitely* (2005) 35 Cal.4th 514, 560 [no cumulative error when the defendant's claimed errors were rejected or found "nonprejudicial on an individual basis"]; *People v. Garton* (2018) 4 Cal.5th 485, 521 [same]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [same].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

30