Filed 4/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G058168 |
|      v. | (Super. Ct. No. 17NF1205) |
| JACK JUNIOR HORN, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge. Affirmed.

Quinn & Dworakowski and David Dworakowski for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

Under California law, a defendant claiming self-defense must prove he subjectively believed in the need to defend and such belief was objectively reasonable. This case deals with that objective reasonableness requirement. We must decide whether the jury should have been allowed to consider the defendant's physical limitations in determining whether his belief in the need for self-defense was objectively reasonable.

We start – and will conclude – with words of the United States Supreme Court. As far back as 1896, the Court recognized that the jury in a self-defense case is entitled to consider "any evidence, which, according to the common experience of mankind, tend[s] to show that the defendant had reasonable cause to apprehend great bodily harm from the conduct of the deceased" at the time of the alleged offense, including the physical characteristics of the defendant. (*Smith v. United States* (1896) 161 U.S. 85, 88.) Roughly a decade later, our own Supreme Court echoed that sentiment in ruling the physical condition of the defendant is a relevant factor in determining whether his belief in the need for self-defense was reasonable. (*People v. Smith* (1907) 151 Cal. 619, 626-629 (*Smith*).)

Consistent with these century-old decisions, we hold a defendant's physical infirmities are a proper consideration for the jury in deciding the reasonableness of his claim of self-defense. Since the reasonableness issue turns on how the situation appeared to the defendant, and how a reasonable person would have reacted under similar circumstances, it seems to us what the defendant knew about his physical infirmities is an indispensable part of the equation.

But in reaching this conclusion, we must part company with *People v. Jefferson* (2004) 119 Cal.App.4th 508 (*Jefferson*) and *People v. Brady* (2018) 22 Cal.App.5th 1008 (*Brady*), to the extent they include language indicating the defendant's physical infirmities have no bearing on the reasonableness prong of self-defense. We believe this language conflicts with Supreme Court precedent and was unnecessary to

2

decide the actual issues that were presented in *Jefferson* and *Brady*. Therefore, we decline the Attorney General's exhortation to follow those decisions in this case.

The case arose when defendant Jack Junior Horn shot Eugene Di Luigi following a dispute over Di Luigi's dogs. Although defendant was charged with attempted murder, the jury acquitted him of that offense and found him guilty of the lesser included offense of attempted voluntary manslaughter. Defendant's sole contention on appeal is that the prosecutor misstated the law in closing argument by telling the jury his physical infirmities were immaterial to whether his belief in the need for self-defense was objectively reasonable. We agree and publish to address the case law relied upon by the Attorney General and also to illustrate how the mistake made by the prosecution here can be remedied. We conclude the trial court rectified the prosecutor's misstatement by subsequently instructing the jury about the relevance of defendant's physical infirmities on his claim of self-defense. Accordingly, we affirm the judgment.

FACTS

On the morning of October 3, 2016, defendant and Di Luigi went for separate walks on the hiking trails at Yorba Linda Lakebed Park. Defendant, then age 73, was with his wife Linda, and Di Luigi, 64, was with his three dogs. At one point, the two groups crossed paths, and defendant told Di Luigi to leash his dogs. What happened after that was the subject of great dispute at trial.

According to Di Luigi, defendant was livid about his dogs not being on a leash. He made a stabbing motion toward one of the dogs with his walking stick and may have threatened to kill the dog. Then, while Di Luigi was bending down toward the dogs, defendant took a "baseball" style swing at him with his stick. Di Luigi managed to block the blow slightly with his hand, but the stick still struck him hard on the side of his head.

Defendant then began punching Di Luigi, and they struggled over the walking stick. Eventually, Di Luigi got hold of the stick and threw it into the bushes.

3

But that was not the end of things. As Di Luigi was walking away, defendant passed him on the trail and then turned around, facing Di Luigi with a gun in his hand. Di Luigi told defendant to ease up, and Linda urged him to put away the gun, but defendant fired a shot into Di Luigi's chest, narrowly missing his heart. Wounded as he was, Di Luigi managed to call 911 and summon help. Defendant and Linda stayed with him on the trail until the police arrived, and he was airlifted to a hospital for emergency life-saving surgery.

Defendant offered a very different version of events. He testified that after he told Di Luigi to leash his dogs, Di Luigi charged toward him in a fit of rage. Defendant held up his walking stick and took out his gun for protection.[1] Defendant said he also yelled out, "Stop. Stay away," but Di Luigi did not. Instead, he snatched the stick and raised it up like he was going to strike defendant in the head with it. At that point, defendant shot Di Luigi because he felt he had no other option.

Defendant also testified about his physical impairments. In addition to a torn rotator cuff, he said he had severe spinal stenosis and had been warned by his doctor that he could become paralyzed if he ever took a hard fall. His fragile physical state was very much on his mind when Di Luigi came charging at him on the trail. In fact, he said the reason he drew his gun on Di Luigi is because he was "sincerely worried about getting paralyzed."[2]

Defendant was charged with attempted premeditated murder, assault with a semiautomatic firearm, and enhancements for inflicting great bodily injury and using a firearm. At trial, the jury was instructed on the lesser included offense of attempted voluntary manslaughter, based on the theories of heat of passion and imperfect self-defense. However, defense counsel did not pursue either one of those theories. Instead,

---

[1]     Defendant, a retired sheriff's deputy, had a permit to carry concealed weapons. He testified he always took a gun with him when he walked on the trails.

[2]     Defendant's testimony about his spinal problems was corroborated by his wife Linda. Linda also testified Di Luigi may have whacked defendant with the walking stick right before the shooting. Although defendant had no memory of that happening, after the shooting he did have bruising on his right arm that was consistent with blunt force trauma.

4

he argued defendant was not guilty of *any* crime because he shot Di Luigi in pure self-defense.

In the end, the jury rejected this argument. Although it acquitted defendant of attempted premeditated murder, it found him guilty of attempted voluntary manslaughter. It also convicted him on the assault charge and found the enhancement allegations true. The trial court sentenced defendant to an aggregate term of nine years in prison for his crimes.

## DISCUSSION

Defendant contends the prosecutor misstated the law on self-defense in closing argument. The alleged misstatement relates to the relevancy of defendant's physical impairments at the time of the shooting. The prosecutor admitted defendant's spinal problems were relevant in determining whether he had an honest subjective belief in the need for self-defense. However, the prosecutor told the jury defendant's spinal problems had no bearing on whether any such belief was objectively reasonable, which is an additional requirement for self-defense. For the reasons explained below, we find this statement was legally incorrect. However, we also find the trial court's curative instructions on the topic were sufficient to disabuse the jury of the incorrect impression left by the prosecutor's statements.

The relevant background for our analysis is extensive. It begins on the cusp of closing arguments, when the trial court gave preliminary instructions to the jury. The court explained it is not uncommon for attorneys to inadvertently misstate the law during their closing remarks. The court also told the jurors that it was the final arbiter on all legal issues, so if the attorneys said anything that conflicted with the court's instructions on the law, the jurors must disregard the attorneys' statements and follow the court's instructions.

In his opening argument, the prosecutor did not mention defendant's spinal problems in discussing the issue of self-defense. He simply argued defendant was not a

credible witness and the factual circumstances surrounding the shooting were inconsistent with his claim of self-defense.

Defense counsel disagreed in his closing argument. With respect to the issue of self-defense, he told the jurors they needed "to get in [defendant's] boots." More particularly, he said it was important for the jurors to consider defendant "suffers from a spine condition, and that spine condition is like, they call an eggshell plaintiff. He's walking around, and if he falls down, bad fall, or if he gets hit, he could have paralysis." Given defendant's fragile physical state and fear of paralysis, defense counsel argued his actions were both subjectively honest *and* objectively reasonable, so as to justify an acquittal on the basis of self-defense.

The prosecutor did not object to those remarks when made, but in his rebuttal argument, he took great umbrage to them. In addressing the objective reasonableness requirement of self-defense, he stated, "The defense told you you have to get into the defendant's boots. That is not true. You do not consider the defendant's sickness, his physical limitations. It is a reasonable person standard."

Defense counsel objected to this argument as a misstatement of the law, but the trial judge court did not rule on the objection. He simply told the jurors that what the attorneys say in closing argument is not evidence, nor should it be presumed to be a correct statement of the law. Instead, they must follow the court's instructions on the law.

The prosecutor then started to read a case quotation to the jury that purportedly supported his position that defendant's physical limitations were irrelevant to the objective reasonableness prong of self-defense. However, upon objection by the defense, the judge nipped that in the bud and told the jury to disregard the quote. The basis for the ruling was the judge's disapproval of the practice of quoting cases during closing argument; the judge did not address the propriety of the argument from a substantive standpoint.

6

So, the prosecutor tried a different tack. He directed the jury's attention to CALCRIM No. 3470, the standard instruction on self-defense that was given in this case. Borrowing from the instruction, the prosecutor stated, "[']When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known and appeared to the defendant, and consider [what a] reasonable person in a similar situation with similar knowledge would have believed. . . .['] [¶] In other words, when you're considering self-defense, you do not adopt the defendant's situation, meaning, you don't consider his physical limitations[.]"

That again prompted defense counsel to object on the basis the prosecutor was misstating the law. However, the judge overruled the objection and told the jury to "keep in mind [his] previous admonition."

The prosecutor therefore had no compunction about reiterating his argument. He told the jury, "I'm reading exactly what the court is going to instruct you right now. [¶] ['] Consider what a reasonable person in a similar situation with similar knowledge would have believed. ['] In other words, the reasonable person's standard. You do not step into the boots of the defendant for self-defense. [¶] How does that apply to this case? The defense has been arguing that the defendant was worried that he would fall down and become paralyzed. That is not applicable to self-defense because you take what a reasonable person, not considering any physical limitation of the defendant, what a reasonable person would have done in the same situation."

The prosecutor then contrasted this with the law on *imperfect* self-defense. He stated, "[R]emember, imperfect self-defense is just for reducing the attempted murder to attempted voluntary manslaughter, this is where you step into the defendant's boots." While conceding the evidence of defendant's spinal problems and subjective fear of paralysis was relevant to the issue of imperfect self-defense, the prosecutor said it was not pertinent to the question of whether defendant's actions were objectively reasonable for purposes of perfect self-defense. Therefore, while the jury could use that evidence to

7

find defendant guilty of the lesser included offense of attempted voluntary manslaughter, it could not use it to acquit him altogether.

Defense counsel, having gotten nowhere with his earlier objections, did not object to these remarks. However, as the judge was finishing up his final instructions to the jury, defense counsel asked for a sidebar.

Defense counsel told the judge the reason he did not keep objecting to the prosecutor's remarks is because he did not want to draw further attention to them. Nevertheless, he wanted to reiterate his objection to those remarks as misstating the legal effect of defendant's spinal problems on his claim of self-defense. Defense counsel felt the prosecutor's remarks on that subject warranted a curative instruction, and if one could not be fashioned to overcome the prejudicial effect of what the prosecutor told the jury, then the court should declare a mistrial.

Because it was late in the day, the judge deferred ruling on defense counsel's requests and adjourned court for the evening. He also instructed his reporter to prepare transcripts of the closing arguments for counsel so they could review them overnight and be prepared to take up the issue first thing in the morning.

When court reconvened the next day, the judge informed counsel that having reviewed the closing arguments himself, he too was troubled by some of the prosecutor's remarks on the subject of self-defense. In particular, the judge expressed concern about the prosecutor's statement that defendant's physical impairments and fear of paralysis were irrelevant to the issue of whether his belief in the need for self-defense was objectively reasonable. The court felt those circumstances were in fact germane to the issue because the jury is required to assess reasonableness from the point of view of a reasonable person *in the position of the defendant*.

Relying on *Jefferson* and *Brady*, the prosecutor disagreed. He argued those cases stand for the proposition that the reasonable person standard for self-defense assumes a person of sound mind *and* sound body. The judge acknowledged *Jefferson*

8

and *Brady* contain language to that effect. But he felt that language was dicta, and thus not controlling in this case, because *Jefferson* and *Brady* involved defendants who had mental impairments, not physical ones. Therefore, contrary to what the prosecutor had argued to the jury, defendant was entitled to have the jury consider his physical limitations in deciding the reasonableness of his belief in the need for self-defense.

However, the judge did not think the prosecutor's argument warranted a mistrial. Rather, he felt a curative instruction would be sufficient to ensure the jurors would not be misled by what the prosecutor had told them. With that in mind, the judge called the jurors into the courtroom and gave them the following admonishment:

"Jurors, the court has some concern that the jury might have been confused by a brief portion of closing argument yesterday regarding self-defense. The court is concerned that the jury might be under the mistaken belief that any subjective belief by [defendant] of his physical limitations would be irrelevant to whether self-defense existed.

"As noted in your instructions, when considering self-defense, the jury is to consider whether the defendant himself actually and reasonably believed in the need to use self-defense, and whether such belief was objectively reasonable. That is, the jury is to judge the reasonableness from the point of view of a reasonable person in the position of the defendant.

"Again, please refer to the jury instructions I have given you, and a copy of which you will have in a moment during your deliberations.

"As it regards self-defense and imperfect self-defense, you are ordered to be guided by the standards as set forth in your formal jury instructions that you will have in the jury room. To the extent that any argument yesterday conflicted with those instructions, you are to disregard such argument."

Following those remarks, the judge ordered the jury to commence its deliberations. However, that was not the end of the issue. Soon after the jury began

9

deliberating, the judge met with the attorneys to discuss defense counsel's complaint that the court's curative instruction did not go far enough in terms of remedying the prosecutor's misstatements. Defense counsel not only criticized the instruction for failing to identify the prosecution's particular misstatements, he faulted the judge for not specifically telling the jury that defendant's physical limitations and fear of paralysis were in fact relevant to whether his belief in the need for self-defense was reasonable. The judge was not receptive to these complaints. Thinking his curative instruction was sufficient, he denied defendant's request for further instruction on the issue and his renewed request for a mistrial.

Undeterred, defense counsel brought up the issue yet again on the second day of deliberations. He wanted the judge to give the jurors a pinpoint instruction, telling them specifically that 1) the prosecutor misstated the law in arguing defendant's physical limitations and fear of paralysis were only relevant to the subjective element of self-defense, and 2) those circumstances were in fact relevant to both the subjective *and* the objective elements of self-defense. Although the judge declined to instruct the jury in those exact terms, he did give the jury the following supplemental instruction: "In considering self-defense issues, you must take into account any physical impairment the defendant had in determining how a reasonable person with such disabilities would have acted."

After that, the jury resumed its deliberations, which went on for another two and a half days. During that time, the jury requested a readback of defendant's and Linda's testimony, which was provided. As noted above, the jury ultimately rejected defendant's claim of self-defense and convicted him of the lesser included offense of attempted voluntary manslaughter.

DISCUSSION

The general parameters of the law on self-defense are clear. As our Supreme Court explained in *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*),

10

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.]" (*Id*. at p. 1082, fn. omitted.) In other words, "'self-defense requires both actual subjective belief and objective reasonableness . . . .' [Citation.]" (*Id*. at p. 1093 (concur. opn. of Brown, J.).) These principles also apply to self-defense in the context of *attempted* murder and *attempted* voluntary manslaughter. (See, e.g., *People v. Viramontes* (2001) 93 Cal.App.4th 1256; *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825.)

In *Humphrey*, the defendant was tried for murder for fatally shooting her abusive boyfriend. The trial court allowed the jury to consider evidence of battered women's syndrome, including expert testimony about how battered women perceive and react to threatening behavior from their significant others, on the subjective prong of self-defense. But the trial court did not permit the jury to consider that evidence in deciding whether the defendant's belief in the need for self-defense was objectively reasonable. (*Humphrey, supra*, 13 Cal.4th at pp. 1077-1081.)

On appeal, following the defendant's conviction for voluntary manslaughter, the Supreme Court found that limitation was improper. The court determined evidence of battered women's syndrome "may help the jury understand the circumstances in which the defendant found herself at the time of the killing[.]" (*Humphrey, supra*, 13 Cal.4th at p. 1076.) The evidence "'not only explains how a battered woman might think, react, or behave, it places the behavior in an understandable light[]'" to the average person. (*Id*. at p. 1088, quoting *People v. Day* (1992) 2 Cal.App.4th 405, 419.) Therefore, the jury should have been allowed to consider it in

11

deciding both the subjective *and* the objective elements of self-defense. (*Id*. at pp. 1083-1089.)

That holding was grounded in the realization that the subjective and objective components of self-defense are not unrelated and that a defendant's personal understanding of the risks presented logically pertains to the objective reasonableness of his thoughts and actions. (*Humphrey, supra*, 13 Cal.4th at pp. 1083.) The court made clear that evidence bearing on the defendant's perception of the danger presented by the victim's actions is important because it assists the jury in understanding the defendant's perspective and how a reasonable person would have acted under similar circumstances. (*Id*. at p. 1087.) As the *Humphrey* court put it:

"Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' [Citation.] It judges reasonableness 'from the point of view of a reasonable person *in the position of defendant* [Italics added.] . . . .' [Citation.] To do this, it must consider all the ""facts and circumstances . . . in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.'" [Citation.] As we stated long ago [in *Smith, supra*, 151 Cal. at 628], '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' [Citation.]" (*Humphrey, supra*, 13 Cal.4th at pp. 1082-1083.)

In *Smith*, the Supreme Court made clear that one of those elements is the actual physical condition of the defendant. Indeed, the court stated that when a defendant relies on self-defense, his physical condition "is always important . . . in determining what a reasonable man in the position of the defendant would have done under the same conditions." (*Smith, supra*, 151 Cal. at p. 628.) *Smith* believed this principle was grounded in common sense and common life experience. In language directly applicable to the case at hand, the court stated, "It is only natural that one unable to successfully

12

resist a dangerous assault made upon him because suffering from disease which has impaired his strength would more readily believe he was in imminent danger than if he were healthy and vigorous. Of course, the belief of the defendant that he was in such danger would not be conclusive. It would be for the jury to determine whether as a reasonable man he was justified in so believing. But in determining that question a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind, and as a debilitated physical condition preventing him from successfully resisting his assailant might reasonably be expected so to do, a defendant is entitled to have evidence of that fact, if it be a fact, go before the jury to be considered by them, with the other circumstances in the case, in ascertaining whether the plea of self-defense is sustained." (*Ibid*.; accord, *People v. Moore* (1954) 43 Cal.2d 517, 523-524 [in case involving claim of self-defense, the defendant's glandular condition was relevant to show the relative physical strength of the defendant and the victim]; see generally 41 C.J.S. Homicide (Feb. 2021 update) [when self-defense is alleged, the defense is entitled to present evidence regarding the physical characteristics of the parties, including that the accused was weak, enfeebled or disabled].)

Based on the Supreme Court's decisions in *Smith* and *Humphrey*, we conclude defendant was entitled to have the jury consider his spinal problems and fear of paralysis in determining whether his belief in the need for self-defense was objectively reasonable. Those circumstances not only informed defendant's subjective understanding of the risks presented by Di Luigi's actions, they had a logical bearing on what a reasonable person in a similar situation, and with similar knowledge, would believe. Accordingly, it was error for the prosecutor to argue otherwise.

That error does not appear to have been made in bad faith, however. As the trial court acknowledged below, the prosecutor's arguments respecting defendant's physical limitations find support in the two cases he relied upon, *Jefferson* and *Brady*. The problem is, those cases deal with the relevance of a defendant's *mental* disabilities.

13

Although the Attorney General continues to stand behind them as a way of justifying the prosecutor's comments in this case, we believe *Jefferson* and *Brady* are factually inapt and contain dicta about the law of self-defense that is easily misapplied.

In *Jefferson*, the defendant argued the jury should have been allowed to consider his schizophrenic mental state in determining whether his unprovoked attack on prison guards was objectively reasonable for purposes of his self-defense claim. The *Jefferson* court rejected his argument on the basis that "a reasonable person is not one who hears voices due to severe mental illness." (*Jefferson, supra*, 119 Cal.App.4th at p. 519.) We have no qualms with that statement. However, rather than just speaking to the relevance of a defendant's mental problems – which were the only type of problems the defendant in *Jefferson* had – the court's analysis expanded into the realm of physical problems as well. Relying on civil cases sounding in negligence, *Jefferson* ultimately decided that the reasonable person standard for self-defense "is an abstract individual of ordinary mental *and physical* capacity who is as prudent and careful as any situation would require him to be." (*Ibid*., italics added, citing *Davidson Steamship Co. v. United States* (1907) 205 U.S. 187 [tort action involving negligent steamboat captain]; *Katz v. Helbing* (1928) 205 Cal. 629 [tort action involving negligent construction company]; *Fouch v. Werner* (1929) 99 Cal.App. 557 [tort action involving negligent motorist].)

This broad statement respecting the reasonable person's physical capacity was uncritically adopted by the court in *Brady*. Even though Brady's claim centered on the relevance of his "bipolar disorder, posttraumatic stress disorder, and [abusive] personal history," the court construed the objective element of self-defense as turning on what a person of ordinary "'mental *and physical* capacity'" would have believed under the similar circumstances. (*Brady, supra*, 22 Cal.App.5th at pp. 1010, 1015, italics added, quoting *Jefferson, supra*, 119 Cal.App.4th at p. 520.) Thus, we cannot fault the prosecutor in this case for arguing defendant's physical limitations were irrelevant to the objective reasonableness of his self-defense claim.

14

Still, the fact remains that *Jefferson* and *Brady* involved defendants who were *mentally* impaired, not physically disabled.[3] Their statements regarding the reasonable person's physical capacity strike us as nothing more than tangential dicta meant to bolster their point about another issue altogether. They are not controlling in circumstances such as these.

Interpreted as the prosecutor did in this case, those statements conflict not only with common sense – a reasonable person's response will *always* be measured by the circumstances with which that person is confronted; how can that not include his/her ability to respond to threat? – but also with the Supreme Court's contrary holding in *Smith* that the standard of reasonableness in self-defense encompasses consideration of the defendant's physical disabilities. As a matter of stare decisis, we cannot diverge from *Smith's* holding about the relevance of such disabilities in a case involving self-defense (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) but neither do we see any reason to question that holding.

*Smith* makes eminent sense from both a practical and a legal standpoint. While jurors cannot reasonably be expected to step into the shoes of a mentally deranged defendant, it is not too much to expect them to understand how a defendant's physical limitations may affect his perception of danger and the reasonableness of his belief in the need for self-defense.

Contrary to the Attorney General's belief, expecting this of jurors will not result in there being separate standards of self-defense for physically disabled and able-bodied defendants. (See *Humphrey, supra*, 13 Cal.4th at p. 1087 [explaining that its decision should not be interpreted as replacing the reasonable person standard with a

---

[3] In addition to his mental infirmities, the defendant in *Brady* also had a seizure disorder and was partially blind. However, the essence of his argument related to the exclusion of evidence pertaining to his mental impairments and how those impairments may have affected his ability to accurately perceive the threat he faced. (See *Brady, supra*, 22 Cal.App.5th at p. 1010.) Unlike the defendant in our case, he did not offer any evidence his perception of danger was heightened by virtue of his physical impairments, and the *Brady* court did not discuss that issue in its substantive analysis.

15

reasonable battered woman standard].) No matter what the defendant's physical condition may be, he still must comport himself in a manner expected of a reasonable person. The only difference is that when a defendant has physical limitations that hamper his ability to defend himself, the jury must factor those limitations into its analysis by asking whether the defendant acted in the way a reasonable person with similar limitations would have acted. In the end, however, "the objective reasonable person standard remains." (*People v. Mathews* (1994) 25 Cal.App.4th 89, 99.) The "ultimate question" for the jury is whether a reasonable person in defendant's situation "would believe in the need to kill to prevent imminent harm." (*Humphrey, supra*, 13 Cal.4th at p. 1087.)

For all of these reasons, we conclude it was error for the prosecutor to tell the jury to ignore the factual circumstances relating to defendant's physical limitations in deciding whether his belief in the need for self-defense was objectively reasonable.

We now turn to the issue of the likely impact of the trial judge's curative instructions. Although a prosecutor's misstatements of the law in closing argument are serious business, they are generally deemed to be curable by an admonishment from the court. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) While some misstatements are harder to cure than others, we must always keep in mind that jurors are presumed to understand and follow all of the instructions they are given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Indeed, that presumption is a crucial underpinning of our constitutional system of trial by jury. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

In this case, the judge's initial curative instruction may not have gone far enough. The judge conveyed his concern the prosecutor's closing remarks regarding self-defense may have been confusing, and he recognized those remarks might have misled the jury into believing defendant's physical limitations were irrelevant to his claim of self-defense. In addition, the judge told the jurors that, regardless of what the prosecutor argued, in determining whether the defendant's belief in the need for self-

16

defense was objectively reasonable, they must assess reasonableness from the perspective of a reasonable person *in the position of the defendant*. But it was not made clear that the judge was telling them they *must* consider any physical limitations they thought affected the defendant. While that may have been the general import of his remarks, we are nonetheless sympathetic to defense counsel's insistence the problem had not been cured.

But we do not have to determine whether that original admonition was sufficient. If the jury had any lingering doubts about this issue, they were surely put to rest by the judge's supplemental instruction on the topic, which was short and to the point. Having alerted the jury to the fact there was a problem with the prosecutor's argument in his first attempt to clarify the issue, the judge this time told the jurors in no uncertain terms that in considering the issue of self-defense, they "must take into account any physical impairment the defendant had in determining how a reasonable person with such disabilities would have acted." This instruction crystallized the point that objective reasonableness is judged by a reasonable person who has the same physical limitations as the defendant. It seems clear the jury would now have known they were to consider defendant's spinal problems in determining whether his belief in the need for self-defense was objectively reasonable.

In arguing otherwise, defendant contends the supplemental instruction was incomplete because it omitted the fact that his state of mind, i.e., his fear of paralysis, was also a relevant consideration in the jury's reasonableness analysis. However, per CALCRIM No. 3470, the jury was required to consider all the circumstances known to the defendant, and what a reasonable person with similar knowledge would have believed, in deciding the reasonableness of his belief in the need for self-defense. This verbiage contemplates consideration of the defendant's subjective understanding of the risks presented by the attendant circumstances. Therefore, in addition to considering defendant's physical limitations, the jury would have known they were to consider how

17

those limitations played on defendant's mind in deciding whether his belief in the need for self-defense was objectively reasonable.

Defendant also faults the court's supplemental instruction for failing to tell the jury the prosecutor's comments about the legal significance of defendant's physical limitations were wrong and must be disregarded. However, by telling the jurors that they *must* take into account the defendant's physical limitations in deciding how a reasonable person in his situation would have acted, the supplemental instruction made clear that the prosecutor's arguments to the contrary were incorrect and of no legal significance. There was no need for further elaboration of this point.

Lastly, defendant cites the timing of the supplemental instruction as a reason it may have not been effective in terms of curing the prosecutor's misstatements. We recognize the supplemental instruction was not given until the second day of deliberations. However, after that, the jury deliberated another two and a half days before rendering its verdict; the jurors had ample time to process the instruction and incorporate it into their deliberations. Justice Frankfurter's words seem apropos here, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." (*Henslee v. Union Planters National Bank & Trust Co.* (1949) 335 U. S. 595, 600, dis. opn. of Frankfurter, J.)

All things considered, we are confident the judge's curative "wisdom" was sufficient to rectify the prosecutor's misstatements of the law and inform the jury's deliberations, thus allowing them to apply the correct legal standard in assessing defendant's claim of self-defense. Those misstatements are therefore not cause for reversal.

18

DISPOSITION

The judgment is affirmed.


                                    BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


GOETHALS, J.